Lenk, J.
The plaintiff, Susan Parkins (“Susan”), formerly a student in the tenth grade at Worcester North High School (“North High”), brought this action against various administrators and officials of . the Worcester public school system. Susan alleges that she was wrongfully expelled for bringing a weapon to North High in November 1993. The defendants are: Robert Boule, the principal of North High who recommended that Susan be expelled; Dr. James Garvey, Superintendent of the Worcester public school system (‘Worcester Public Schools”) who upheld Susan’s expulsion; and the members of the Worcester School Committee (“School Committee”) who had no role in the expulsion of this student.[3] Susan, in a sixteen-count complaint, contends that her expulsion was an abuse of discretion, violated her rights as guaranteed by the state and federal constitution, and was either outside the defendants’ statutory authority under G.L.c. 71, §37H (“Section 37H”), or, if not, that Section 37H is then facially unconstitutional.
On April 28, 1994, Susan moved for a temporary restraining order which was denied. A non-evidentiary hearing took place on May 6, 1994 regarding Susan’s request for preliminary injunctive relief seeking, inter alia, reinstatement at North High. In light of the gravity of the issues raised, the court’s desire to hear additional evidence and the nature of the ultimate relief requested, the motion for preliminary injunction was consolidated with a trial on the merits pursuant to Mass.R.Civ.P. 65(b)(2) and the matter was advanced for trial. The jury-waived trial was held on June 20 and 21, 1994 where the testimony of five witnesses was stenographically transcribed. Fifteen exhibits were admitted into evidence.
FINDINGS OF FACT
The Weapons Policies and Statutory Scheme
In March of 1989, the School Committee established a policy which specifically addressed the issue of weapons possession by students on school grounds. This policy was adopted shortly after a student had been stabbed to death at Worcester South High Community School. The policy provided that the School Committee would automatically expel for a minimum of one year any student who brought a gun or a knife to school. The superintendent would first hold a hearing on the matter and then could refer it to the school *332 committee for a further hearing on whether to expel the student.[4] A student could apply for readmission after one year.
In 1993, the Legislature enacted the Education Reform Act which significantly altered the power of schools to expel students. St. 1993, c. 71, §36. The Act amended Section 37H to make it easier to expel students who possessed a weapon at school or at school-related functions. Section 37H as amended allows principals, with the superintendent’s approval, to expel students; no written statement of reasons is required. However, when in the exercise of discretion, a student who has violated the prohibition on weapons is suspended instead of being expelled, the principal must provide written reasons for choosing this remedy and must opine that the student does not pose a threat to the safety, security and welfare of others in the school. Schools are required to establish weapons policies and to provide such information to students.
Section 37H provides in pertinent part:
The superintendent of every school district shall publish the district’s policies pertaining to the conduct of teachers and students . . .
Each school district’s policies pertaining to the conduct of students shall include the following: disciplinary proceedings, including procedures assuring due process; standards and procedures for suspension and expulsion of students; . . . standards and procedures to assure school building security and safety of students and school personnel; and the disciplinary measures to be taken in the cases involving the possession or use of illegal substances or weapons . . .
In each school building containing the grades nine to twelve, inclusive, the principal, in consultation with the school council, shall prepare and distribute to each student a student handbook setting forth the rules pertaining to the conduct of students
Notwithstanding any general or special law to the contrary, all student handbooks shall contain the following provisions:
(a) Any student who is found on school premises or at school-sponsored or school-related events, including athletic games, in possession of a dangerous weapon, including, but not limited to, a gun or a knife; or a controlled substance as defined in chapter ninety-four C, including, but not limited to, marijuana, cocaine, and heroin, may be subject to expulsion from the school or school district by the principal . . .
(c)Any student who is charged with violation of . . . paragraph (a) shall be notified in writing of an opportunity for a hearing; provided, however, that the student may have representation, along with the opportunity to present evidence and witnesses at said hearing before the principal.
After said hearing, a principal may, in his discretion, decide to suspend rather than expel a student who has been determined by the principal to have violated . . . paragraph (a) . . . provided, however, that any principal who decides that said student should be suspended shall state in writing to the school committee his reasons for choosing the suspension instead of the expulsion as the most appropriate remedy. In this statement, the principal shall represent that, in his opinion, the continued presence of this student in the school will not pose a threat to the safely, security and welfare of the other students and staff in the school.[5]
(d)Any student who has been expelled from a school district pursuant to these provisions shall have the right to appeal to the superintendent. The expelled student shall have ten days from the date of the expulsion in which to notify the superintendent of his appeal. The student has the right to counsel at a hearing before the superintendent. The subject matter of the appeal shall not be limited solely to a factual determination of whether the student has violated any provisions of this section.
On January 4, 1994, the Massachusetts Legislature amended paragraph (e) of Section 37H to provide:
(e)When a student is expelled under the provisions of this section, no school or school district within the commonwealth shall be required to admit such student or to provide educational services to said student. If said student does apply for admission to another school or school district, the superintendent of the school district to which the application is made may request and shall receive from the superintendent of the school expelling said student a written statement of the reasons for said expulsion.
St. 1993, c. 380, §1.
The School Committee thereafter adopted a new policy which followed this 1993 legislative mandate. During the first week of the 1993-1994 school year, staff at North High distributed copies of the “School Policies, Rules and Services” for North High and “Policies and Programs Handbook in the Worcester Public Schools 1993-1994" (“the Handbooks”). Both documents contain Rule 8, which is entitled ’’Policy on Possession or Use of Weapons." Rule 8 provides that:
[i]f any device which may be considered a weapon under this policy is distributed by a teacher, for use in the classroom, then no student receiving such a device shall be charged with an offense under Rule 8 provided the device remains in the classroom and provided the device is only used for classroom purpose(s).
A student shall not possess, use or attempt to use any weapon on school premises or at a school-related situation, including but not limited to travel to and from the situation.
*333 In order to protect the students of the Worcester Public Schools, any student who is found on school premises or at school-sponsored or school-related events, including athletic games, in possession of a dangerous weapon, including, but not limited to, a gun or a knife may be subject to expulsion from the school by the principal regardless of the size of the knife.
For purposes of this policy, a dangerous “weapon” includes, but is not limited to, a gun, knife, slingshot, blowgun, blackjack, metallic knuckles, including a ring intended to be worn on more than one finger (“fused rings”) or knuckles of any substance which could be put to the same use with the same or similar effect as metallic knuckles, nunchaku, zoobow, also known as klackers or kung fu sticks, or any similar weapon consisting of two sticks of wood, plastic or metal connected at one end by a length of rope, chain, wire or leather, a shuriken or any similar pointed starlike object intended to injure a person when thrown, or any armband, made with leather which has metallic spikes, points or studs or any similar material weighted with metal or other substance and worn on the hand, or a manrikigusari or similar length of chain having weighted ends. Any other device or object used or attempted to be used to inflict bodily harm on a person may be considered a weapon.
This policy will be implemented according to the due process provisions of the Worcester Public Schools Discipline Code applicable to Regular and Special Education students.
Each student at North High received a copy of the Handbooks and was required to sign a form acknowledging receipt. In addition to the Handbooks, there are signs posted in North High which inform students that possession of a gun or a knife in school may result in expulsion. It is currently the policy of the Worcester Public Schools that an expelled student may apply for readmission one year after his/her expulsion. The earlier policy of automatic expulsion for one year for weapons violators has been superseded by the new policy adopted by the School Committee following the enactment of the Education Reform Act.
Susan’s History
Susan and her family moved to Worcester, Massachusetts from Cunningham, Tennessee in November 1992. Susan entered the ninth grade class at North High that same month. Susan was given a copy of the Handbooks at North High and signed a form acknowledging she had received them. She also saw the signs at North High reminding students of the weapons policy. Susan understood that a student who brought a knife into school might be expelled.
Her parents, Marvin and Elaine Parkins (“the Parkins”), experienced some financial difficulties upon their arrival and there were family problems. For example, in the spring of 1993, school officials filed a so-called “51A report” of suspected child abuse with the Massachusetts Department of Social Services after Elaine Parkins was seen hitting Susan during a school softball game. On April 14,1993, Susan ran away from home for five days. Since moving to Worcester, Susan has tried to cut her wrists three times.
Susan’s personal and family problems adversely affected her school work. While Susan had earned good grades in Tennessee, mostly As and Bs, she did not do as well in Worcester, The first semester Susan attended North High, her grades were fine: three As, one B and one C. The next quarter, her grades dropped to one A, one B, two Cs and one F. Her cumulative grades for her ninth grade year were one B, one C and three Ds. During that school year, she also had twenty-three unexcused absences. In September 1993, Susan entered the tenth grade at North High and her grades continued to plummet. During the first two quarters of the 1993-1994 academic year, her grades were all Cs, Ds and Fs. She was also absent twenty-one times.
Susan’s disciplinary record in the ninth and tenth grades was also less than exemplary. On April 5,1993, she was suspended for one day for leaving school without permission. Three days later, she was given an extended suspension for leaving school without permission. On May 14, 1993, Susan was suspended for one day for triggering a false fire alarm in the school building. She was suspended for one day for a smoking violation on June 11, 1993. In September 1993, she was suspended for one day for leaving school without permission, one day for a smoking violation and one day for arriving late to school. She was also suspended for two days for tardiness and cutting class in October 1993.
The Incident
Sometime in October 1993, the mother of Susan’s then-boyfriend gave her a regular-sized lipstick/knife which, when twisted open, reveals a pointed, one-sided, one and one-quarter inch blade. The blade locks in place when fully upright. The blade is sharply pointed at the tip but the cutting edge is dull. When Susan received the gift, she thought of it as a joke. She took the object home and put it in her dresser drawer. She did not touch it again until the day she decided to take it to school.
On the evening of November 4, 1993, Susan tried to cut her left wrist, her third suicide attempt since moving to Worcester. She bandaged it herself and did not tell her parents.
The next morning, on November 5, 1993, Susan noticed the lipstick/knife in her drawer and put it into her pocket. She took it to school to show to her friends. During her fifth period study hall, Susan went to talk with Mr. Nathaniel Seale, her adjustment counselor (“Seale”).[6] She returned to study hall shortly before the end of the period. When Susan reached into her *334 pocket to get a pencil, she felt the lipstick/knife there. She took it out to show her classmates and allowed two other students to hold it.
Mrs. Mariano (“Mariano”), the teacher in the study hall, noticed that Susan’s wrist was bandaged and asked Susan what happened. Susan stated that she hurt herself falling. However, another student in the class spoke up, saying that Susan had cut her wrist and that she had tried to do so once before. Susan then lowered her head to her desk. A student in the rear of the class told Susan to show Mariano the knife that she had. Susan denied having a knife, at which point the student told Mariano that it was in Susan’s lipstick case.
Mariano asked Susan to step into the hallway with her. Mariano asked Susan what was going on and if she had a knife. Susan denied having a knife. She said that her life was a mess and that she was having problems. She admitted to Mariano that she had cut her wrist the night before. Susan began getting upset and Mariano gave Susan a hug. Mariano told Susan to give her the knife and Susan voluntarily did so. Susan asked if she would get it back and whether she was going to be thrown out of school. Mariano said that Susan probably would not get the knife back and it would have to be shown to the assistant principal. At that point, the period ended and Mariano allowed Susan to go to her next class.
Mariano went to see Elizabeth Drake, the assistant principal at North High (“Drake”), and gave her the lipstick/knife. Drake and Seale went looking for Susan and brought her back to Drake’s office to talk. Drake suspended Susan for five days for having a knife in her possession. In addition, Drake was very concerned that Susan had tried to cut her wrist the night before and felt strongly that Susan required a professional evaluation. Drake contacted Susan’s parents and asked them to come to school; they did so. She told them of the suspension and her concerns for Susan’s mental health. Drake arranged for the Parkins to take Susan, that afternoon, to see Dr. Kooper, a psychiatrist with the Emergency Mental Health Clinic at the University of Massachusetts Medical Center (“UMMC”). For an hour and a half, Dr. Kooper evaluated Susan alone as well as with her parents. Susan was released to go home and given a referral for follow-up care at the Worcester Youth Guidance Center. Susan thereafter met numerous times with Sharon Courville, a social worker from the Center.
The afternoon of the lipstick/knife incident, Drake informed Principal Robert Boule that Susan had brought a weapon to school, that Drake had suspended Susan for five days and that there needed to be a principal’s hearing. In addition, Drake contacted George Munoz (“Munoz”) who is Executive Assistant to the Superintendent of the Worcester Public Schools. Munoz coordinates the process of holding principal and superintendent disciplinary hearings by setting up the hearings and, after the principal or superintendent makes a decision, by sending out the decision letters in their name.
Principal’s Hearing
Robert Boule (“Boule”) has been the principal at Worcester North High School for the past two years, since the beginning of the 1992-1993 academic year. He has extensive experience in the educational field, including eight years experience as assistant principal of North High.
Notice was sent to the Parkins family that there would be a principal’s hearing on November 16, 1993. The notice informed the Parkins that Susan was alleged to have violated the weapons policy and could be expelled. The notice also stated that Susan had a right to be represented by an attorney and to present evidence and witnesses on her own behalf. The notice stated that Boule would consider the evidence as to whether Susan had violated the policy and would then provide a written decision with any action which would be taken.
On November 16, 1993, Susan, her parents, Susan’s social worker Mary Mercurio (“Mercurio”), Drake, Boule, Attorney John O’Day of the Worcester Law Department and Munoz were present at the principal’s hearing to determine whether Susan had violated Rule 8. Boule explained the purpose of the hearing. He noted that this was the forum where everyone was to supply him with information in order that he could make a judgment. He also stated that he would base his decision on the information presented at the hearing and that once the hearing was over, no additional information would be taken into consideration.
At the hearing, Drake testified that Susan had received a copy of the weapons policy, that Susan had brought the lipstick/knife to school and that Susan had shown the object to other students but had not used it. Susan testified that she thought the object was a joke. Mercurio, Susan’s social worker, gave her opinion that, although Susan was suicidal, she needed to be in school. Mercurio also gave her opinion that Susan did not think the lipstick/knife was a weapon. Susan’s parents testified that Susan was not a troublemaker. There was no evidence that Susan tried to use the knife.
In making his decision, Boule considered the testimony of Drake, Susan, Mercurio and Susan’s parents. Among the items which Boule also considered was Susan’s signature acknowledging receipt of the Handbooks. In addition, he considered the lipstick/knife itself. He did not consult with Mariano, the teacher who discovered the object.
Boule ultimately decided to expel Susan because, in his opinion, she was a threat to the safety of students and staff at the school. His decision was based upon many factors, including the fact that *335 Susan had on three recent occasions tried to kill herself and that she brought the lipstick/knife to school notwithstanding her knowledge of school policy and showed it to other students. Boule considered the lipstick/knife to be a knife proscribed by Rule 8. Boule considers a knife of any length, which is possessed by a student in school, regardless of the student’s intent to use the knife, to be a dangerous weapon. While Boule thought that Susan was genuinely remorseful over her actions, he also felt that she had knowingly violated Rule 8.
Boule called Munoz to tell him of his decision but did not explain why he decided to expel Susan. Munoz then prepared a letter to Susan’s parents informing them of Boule’s decision. The letter, dated November 17, 1993, was entitled “Findings of Fact.” It stated:
1. On November 5, 1993, Susan Parkins was a regular education student at North High School.
2. On November 5, 1993, Susan Parkins brought a brown plastic lipstick case that contained a concealed knife with a 1V4 inch blade, which is considered a weapon under Worcester Public Schools’ Program and Policy.
3. On November 5, 1993, Susan Parkins did possess a weapon on school premises in violation of Rule 8 of the [W]orcester (P)ublic (S)chools’ [Program and (P)olicy.
4. In accordance with Section 37H of Chapter 71 of the 1993 Massachusetts Education Reform Law, I hereby expel Susan Parkins from the Worcester Public Schools to become effective on Monday, November 22, 1993.
On the same day, Munoz sent a letter to the Parkins notifying them that Susan would not be eligible to apply for readmission until one year from the date of expulsion, i.e. November 22, 1994.
Superintendent’s Hearing
Dr. James Garvey (“Garvey”) is superintendent of the Worcester Public Schools. He has held various positions in the Worcester Public Schools for the past thirty-four years, including service as both principal and teacher.
The Parkins by letter to Garvey appealed Susan’s expulsion. Munoz later informed the Parkins by letter of the place and time of the superintendent’s hearing and of their right to counsel and to present evidence.
Garvey held a hearing on January 10, 1994, attendees at which included Garvey, the Parkins, Susan, and Attorney David Patterson who then represented Susan. The evidence presented included minutes from the principal’s hearing, Susan’s disciplinary record, and the lipstick/knife object. There also were two letters presented on Susan’s behalf. Sharon Courville (“Courville”), a licensed social worker at Worcester Youth Guidance Center, sent a letter to Garvey regarding Susan’s mental state. She opined, inter alia, that Susan was not then suicidal but that Susan was a troubled child from a family with significant problems. She felt the incident could have been Susan’s way of seeking attention and that Susan needed to continue to receive educational services in some setting. In addition, Dr. Kooper, the psychiatrist from UMMC who had examined Susan on the day of the incident, opined that Susan was not on that day a threat to herself or others.
In deciding whether to expel Susan, Garvey considered the lipstick/knife object itself, Courville’s opinion that Susan was a very unstable person and Susan’s disciplinary record of truancy, tardiness and having pulled a false fire alarm in school. In addition, Garvey considered Susan’s troubled family as a factor weighing in favor of expulsion because, in his experience and opinion, students from such homes have a greater tendency to commit violence in schools. Garvey did not consult with any mental health professionals regarding Susan’s state of mind.
Garvey also had in his thoughts the memory of a student who had been killed in a knife attack by a fellow student in 1989 at another Worcester high school, the incident which had precipitated adoption in 1989 of the first weapons policy. In Garvey’s opinion, mere possession of a weapon in a school setting creates the potential for someone to get hurt. Given his responsibility to provide a safe learning environment for students, Garvey sees no difference between a weapon and a dangerous weapon in the school context.
On January 11, 1994, Garvey decided to uphold Susan’s expulsion. Garvey told Munoz of his decision and Munoz wrote up a short letter to the Parkins, informing them that, “(a)fter careful consideration of all the evidence presented at this hearing, I have made the determination to support Robert Boule’s decision to expel Susan Parkins from the Worcester Public Schools.” Garvey did not otherwise provide any reasons for his decision to the Parkins or Munoz.
On April 7, 1994, Susan’s new attorney, Jane Quimby, petitioned the School Committee to request that Garvey readmit Susan to school. There is no evidence that the School Committee responded to this request.
Alternative Education
Susan has not attended school since November 3, 1993. She has received some tutoring from her mother, who is a substitute teacher, and from a retired school teacher. Susan had begun to fall behind her classmates in her educational work very soon after she started at North High. Due to Susan’s poor performance during the 1992-1993 academic year as well as the ground she has lost since her expulsion, Susan would need remedial education if she were to resume her studies in the same class as her former classmates.
*336 The Worcester Public Schools do not provide alternative education for students who are expelled for weapons violations unless they are special education students. After being expelled, Susan had an evaluation to determine if she could be categorized as a special education student. Had she been a special needs student, the Worcester Public Schools would have been required to provide her with alternative education. Her assessment, however, found that she was not in need of special education services.
The three options for regular students expelled from the Worcester Public Schools are to enroll in a private or parochial school, to participate in the school choice program in a nearby town on a space-available basis or to establish a home study program. While information about alternative education options is generally given to expelled students, no one in the Worcester Public Schools provided such information to Susan or her family nor was there evidence that such information was requested. Susan and her family did not make significant efforts to pursue any alternative education options.
Other Confiscated Weapons
During the 1993-1994 academic school year, principal’s hearings were held for six North High students found in possession of weapons on school property. Susan’s was the first hearing held. Boule decided to expel all six students. The other weapons included a pellet gun, a kitchen knife with a five-inch blade, a one and one-quarter-inch knife blade concealed in a crucifix on a key chain, a hunting knife with a six-inch blade and a buck knife with a four-inch blade. Boule also confiscated a fused ring from a student but did not hold a hearing.
RULINGS OF LAW
I. STATUTORY CLAIMS
A. Abuse of Discretion (Count I)
Susan first alleges that the defendants’ decision to expel her constitutes an abuse of their discretion. Susan argues that Section 37H permits the principal or superintendent to expel a student only upon a finding that the student is a threat to the safety of others. She contends that, because there was no evidence that she was a threat to the safety of others, her expulsion was accordingly not justified.
Specifically, Susan argues that she did not try to use the lipstick/knife and that she was never “aggressive” towards others. She contends that, if school officials considered her prior suicide attempts as indicative of her “dangerousness,” they should have consulted mental health professionals. She disagrees with the interpretation given by Garvey to the letters submitted by her social worker and psychiatrist. She asserts as well that neither Boule nor Garvey gave sufficient weight to her sincere remorse over the incident. Susan argues that consideration should have been given by the defendants to her emotional problems which “would only worsen” by her being expelled. Finally, Susan disagrees with the opinion of Boule and Garvey that all knives in a school setting are dangerous weapons.
Section 37H grants broad discretionary authority to public school principals and superintendents to expel a student “found on school premises ... in possession of a dangerous weapon, including but not limited to, a gun or a knife . . .’’ Section 37H limits a principal’s discretion to suspenda student; it does not limit her discretion to expel. To suspend rather than expel a student, the principal must be of the opinion that “the continued presence of this student in the school will not pose a threat to the safety, security, and welfare of the other students and staff in the school.” G.L.c. 71, §37H. In addition, the principal must “state in writing to the school committee his reasons for choosing the suspension instead of expulsion as the most appropriate remedy.” Id.
When there is such a broad grant of discretionary authority, the standard of review is whether there was an abuse of discretion or whether the decision was arbitrary and capricious. Mayor of Revere v. Civil Service Commission, 31 Mass.App.Ct. 315, 322 (1991). These two equivalent standards require only that there be a “rational basis for decision . . .” Howe v. Health Facilities Appeals Board, 20 Mass.App.Ct. 531, 534 (1985), citing Attorney General v. Sheriff of Worcester County, 382 Mass. 57, 62 (1980).
I do not interpret Section 37H as allowing a principal and superintendent to expel a student only if the student is found to be a threat to others. Nonetheless, even if Section 37H were to be so interpreted, there was sufficient evidence to support the defendants’ conclusion that Susan was such a threat as well as their concomitant unwillingness to opine that she was not. It was rational for Boule and Garvey to conclude, based on the evidence before them, that Susan knew of the weapons policy which prohibited all knives in school, that the blade in the lipstick container was a knife, that Susan knew it was a knife and brought it knowingly onto school premises, and that Susan showed the knife to other students and allowed them to handle it.[7],[8] The defendants were aware of Susan’s emotional problems and her prior suicide attempts. These educators could reasonably have been concerned about unpredictable behavior from this troubled adolescent and they could reasonably fear that Susan might, in an attempt to harm herself, also harm other students or staff who sought to help her. It was not unreasonable to refuse to opine that Susan presented no danger to others. There was no abuse of discretion.
That the defendants did not interpret the evidence submitted by Susan in the manner that she desired or in the way that others might wish they had does not make the defendants’ decision arbitrary or capricious. The defendants have many years of experience with students in the public schools. The long standing *337 judicial reluctance to interfere with the rules, decisions, and acts by which school authorities maintain order, discipline and decorum is based on a healthy respect for the experience and expertise of educators as well as the recognition that broad discretion must rest with those school authorities whose duty it is to educate students in a safe environment within which learning may occur. Cady v. Plymouth-Carver Regional School District, 17 Mass.App.Ct. 211, 216 (1983), citing Leonard v. School Committee of Attleboro, 349 Mass. 704, 705-11 (1965). In the end, there was more than adequate evidence before the defendants to determine Susan was a threat to others and that expulsion was the appropriate remedy.
B. Ultra Vires and Violation of Section 37H (Counts II and XV)
In these two claims, Susan contends that the defendants impermissibly have an unofficial or defacto policy of automatically expelling for one year students caught in possession of weapons. She contends that her expulsion is ultra vires and against the mandates of Section 37H because the defendants acted in accordance with this automatic expulsion policy and thus failed to exercise the discretion bestowed by the statute upon principals and superintendents. In support of this argument, Susan points both to the prior School Committee policy of automatic one-year expulsions and to the fact that the defendants have expelled each of the six students for which disciplinary hearings were held, informing each of the six that he/she could reapply after one calendar year.
Section 37H authorizes certain school officials to expel students who possess weapons. These educators may, in their experience and discretion, determine that the possession of weapons in school, without more, adequately establishes that a student is a threat to the safety of the school community. School authorities have “wide discretion in school discipline matters.” Nicholas B. v. School Committee of Worcester, 412 Mass. 20, 21 (1992), citing Leonard v. School Committee of Attleboro, 349 Mass. 704, 708-09 (1965). That the right to attend school is “not absolute and unqualified, but one to be enjoyed by all under reasonable conditions” is a rule extending back more than a century in this Commonwealth. Sherman v. Inhabitants of Charlestown, 62 Mass. (8 Cush) 160, 164 (1851). Thus, had they chosen to do so, Boule and Garvey could permissibly have established an explicit policy of automatic expulsion for weapons violations. Such a policy would not violate Section 37H.[9]
The defendants, however, did not have a policy of automatic expulsion for violation of the weapons policy or for possession of knives.[10] The defendants held hearings at which sufficient evidence was adduced to enable them to determine whether Susan posed “a threat to the safety, security and welfare of the other students and staff of the school.” G.L.c. 71, §37H. Susan was allowed to present evidence at the hearings on her behalf in order to show that she was not a threat to other students or staff. While the defendants considered the evidence which Susan presented, they also considered evidence that Susan had possessed a knife in violation of a known school policy, that she intentionally brought this knife to school, that she allowed others to handle the knife and that she was emotionally unstable. The defendants’ decisions were within their authority under Section 37H and therefore were not ultra vires.
C. Ultra Vires (Count III)[11]
Susan contends that the lipstick/knife was a “novelty item” and not a dangerous weapon within the scope of Section 37H. Hence, she argues, her expulsion was in excess of the authority granted principals and superintendents. As Section 37H does not define “dangerous weapon,” she urges the court to interpret that term to include only those items listed in G.L.c. 269, §10(b) (“Section 10(b)"), which provides criminal penalties for possession of dangerous weapons.[12]
Because of the inherent dangerousness of certain types of knives, the Legislature has made it a crime merely to possess such knives on one’s person; there is no requirement that the knife be used in any manner, threatening or otherwise because such knives are per se dangerous weapons. However, the Legislature “did not intend to encompass all knives in its enumeration of‘per se’ dangerous weapons.” Commonwealth v. Miller, 22 Mass.App.Ct. 694, 694 n.1 (1986). Instead, Section 10(b) “outlaw[s] the carrying of those knives which are primarily designed for stabbing human beings or for other unlawful objectives.” Id. at 696. Thus, a knife that is not specifically listed in Section 10(b) may not be considered per se a dangerous weapon. Commonwealth v. Blavackas, 11 Mass.App.Ct. 746, 752 (1981). Knives other than those listed in Section 10(b) may be considered dangerous only when used. Id.
If the court were to interpret the term “dangerous weapon” in Section 37H to include only those items specifically listed as dangerous per se in G.L.c. 269, Section 10(b), then the lipstick/knife which Susan carried would not be a “dangerous weapon." On this theory, principals and superintendents can only expel a student under Section 37H for a weapons violation if the student is in possession of a weapon specifically designated as a “dangerous weapon” under the criminal statute G.L.c. 269, §10(b). If the student brings to school a weapon not specifically listed in G.L.c. 269, § 10(b), he/she cannot be expelled for possession thereof by a principal or superintendent acting pursuant to Section 37H. Such a student could presumably only be expelled by the school committee acting under its general disciplinary authority pursuant to G.L.c. 76, §17. Hence, Susan argues, her expulsion under Section 37H for mere possession of a weapon not specifically listed as a “dangerous weapon” in G.L.c. 269, §10(b), was ultra vires because Boule and Garvey *338 were without authority to expel her. On this view, Boule and Garvey could not have expelled her unless Susan had first used the lipstick/knife and it thereby became a dangerous weapon.
The court rejects the interpretation of Section 37H which Susan urges. There is no sound basis, absent a specific legislative mandate, to import into a school setting a standard required by the criminal law. The Supreme Court has noted that “[a] school is an academic institution, not a courtroom or administrative hearing room.” Board of Curators v. Horowitz, 435 U.S. 78, 88 (1978). Schools are charged with the daunting task of educating children from diverse backgrounds, with diverse abilities, needs and problems. They are to do this in an increasingly complex and violent world, whose difficulties permeate the classroom. If effective education is to be possible, school authorities must provide and maintain a safe learning environment. Educators of necessity have broad authority to maintain order, discipline and safety; the exercise of such authority must be left to their sound discretion since so many variables are inherently involved.
Laws which govern the education of minors do not serve the same ends as the criminal laws which proscribe certain adult conduct. There is no reason to believe that the Legislature wished to limit the types of knives which a student was forbidden to bring to school. Indeed, there is no reason to believe that the Legislature wanted school authorities to forbear with respect to those knives not included within the criminal statute until such time as those knives are actually used by students and increase the risk to others in the school community. The language of Section 37H, which appears to further the goal of making schools free of weapons, does not suggest otherwise.
The language of G.L.c. 269, § 10(b) and the common law which interprets it define “dangerous weapon” solely within the context of the criminal law. The language of G.L.c. 269, §10(b) was not incorporated by the Legislature when it enacted Section 37H. This omission can only be viewed as intentional since, in the very same sentence, the Legislature specifically defined prohibited illegal substances as “controlled substance(s) as defined in chapter ninety-four C.” G.L.c. 71, §37H.[13] If the Legislature intentionally omits language from a statute, no court can supply it. Boylston Water District v. Tahanto Regional School District, 353 Mass. 81, 84 (1967), citing Mitchell v. Mitchell, 312 Mass. 154, 162 (1942). If the Legislature had intended the limited definition of “dangerous weapon” as set forth in G.L.c. 261, §10(b) to be incorporated within Section 37H, it would have said so as it did with respect to proscribed controlled substances. It did not.
The language of Section 37H authorizes the expulsion of students who are in possession of “a dangerous weapon, including, but not limited to,... a knife.” The Legislature used the generic term “knife” as being included within the term “dangerous weapon” as employed in Section 37H. The Legislature gave no indication whatever of any intent to limit the term “dangerous weapon” to those knives specifically proscribed by G.L.c. 269, §10(b). Indeed, particularly in light of the broad authority historically conferred on educators who work in and with a multiplicity of circumstances, it must be presumed that the Legislature wished to leave the determination of whether a particular object was a gun or a knife (and thus, in the school context, a dangerous weapon) in the sound judgment of the principal and superintendent.
In light of the foregoing, this court rules that Susan’s expulsion was authorized by Section 37H and was not ultra vires.
II. CONSTITUTIONAL CLAIMS
A. Procedural Due Process Protections Under the United States and Massachusetts Constitutions (Counts XIII and XIV)
Susan contends that the defendants violated her procedural due process rights as guaranteed by the Fourteenth Amendment of the United States Constitution and Pt. I, Art. X of the Massachusetts Constitution. She contends that defendants violated her rights by “failing to provide findings and conclusions as to how they applied the standards” of Section 37H and “failing to make separate determinations of misconduct and sanctions.’’[14] Susan points to testimony from Boule that he did not include in his decision letter all of the reasons on which he based his expulsion decision and to Garvey’s decision letter which did not include any particularized reasons for his determination to uphold the expulsion.
The Due Process Clauses protect “property" interests from being impaired without some form of notice and hearing.[15] There is a constitutionally protected “property” interest in public education when school attendance is required. Goss v. Lopez, 419 U.S. 565, 581 (1975). Massachusetts mandates that every child between the minimum and maximum ages established for school attendance by the state Board of Education, with certain exceptions, must attend public school. G.L.c. 76, §1. Therefore, Susan has a constitutionally protected property interest in a public education.
Before that property interest can be abridged, due process requires notice and some opportunity to be heard. Id. Suspensions which exceed ten days and expulsions require “more formal hearings,” but the Supreme Court left to the lower courts the determination of the proper standards. See id. at 585. A hearing is necessary to ensure that the “disciplinarian [is] alerted to the existence of disputes about facts and arguments about cause and effect.” Id. at 583-84.
In the case at bar, the principal’s hearing employed process sufficient to satisfy due process requirements. As required by Section 37H, Susan was given written notice of the charges and an opportunity both to present evidence and to be represented by counsel. A *339 recording was made of the proceedings. Susan was also later given a written decision stating the basis of her expulsion. Boule’s decision letter clearly explained that Susan was expelled because she had brought a weapon to school in violation of Rule 8. The foregoing was sufficient to satisfy due process standards. See Pierce v. School Committee of New Bedford, 322 F.Supp. 957, 961 (D.Mass. 1971) (student’s due process rights protected where given right to counsel and present evidence but not allowed to make recording).
The Legislature went beyond the minimum requirements of due process in providing expelled students with certain appeals procedures. See Brewer by Dreyfus v. Austin Independent School District, 779 F.2d 260, 263 (5th Cir. 1985) (although school may wish to provide mechanisms of appeal to cure procedural errors, they are not required to do so by the Constitution). Garvey’s hearing complied with the requirements of Section 37H because, among other things, it was not limited solely to evidence of weapons possession. Garvey’s subsequent decision letter made reference to Boule’s decision and stated that he was upholding it. Since Boule’s decision letter had previously made clear that Susan was being expelled for having violated Rule 8, Susan received adequate notice of the reason for her expulsion. Compare Raper v. Lucey, 488 F.2d 748, 753 (1st Cir. 1973) (person denied driver’s license given no reason for denial). The process accorded Susan satisfied her interest in making sure the disciplinarian was aware of all the facts and that she was not being wrongfully expelled.
B. Substantive Due Process and Equal Protection Under the U.S. Constitution (Counts IX, XI and XVI)
Susan contends in Count IX of her complaint that “expulsion and denial of all education is so disproportionate to any offense [she] may have committed” that it violates her substantive due process rights protected by the Fourteenth Amendment of the United States Constitution. Susan also contends in Count XI that Section 37H, both on its face and as applied, violates her right to equal protection under the Fourteenth Amendment because “permanent exclusion from public education does not further a substantial goal of the Commonwealth.”[16]
A determination of whether Susan’s substantive due process and equal protection rights under the United States Constitution have been unconstitutionally infringed requires first a determination of the appropriate standard of review to employ, i.e. strict scrutiny or the rational basis test.[17] If public education is a fundamental right, then the defendants’ actions merit strict scrutiny. Otherwise, the rational basis test is to be applied.
An individual does not have a fundamental right to an education under the federal constitution.[18] To be deemed “fundamental,” a right must be explicitly or implicitly guaranteed by the Constitution. Plyler v. Doe, 457 U.S. 202, 220-21 (1982); San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 35 (1973). Because education has not been determined by the Supreme Court to be a fundamental right, its forfeiture is not subject to strict scrutiny by the courts. San Antonio, 411 U.S. at 38-40. Instead, education-related issues merit only minimum scrutiny under the rational basis test. Id. (state system of public school financing that relied upon property values was upheld as “rational”). Thus, state action which infringes upon a person’s right to obtain a public education is not unconstitutional under substantive due process analysis so long as that action is directed to a legitimate or substantial purpose and is rationally related to achieving that purpose. Plyler, 457 U.S. at 224; Williamson v. Lee Optical of Oklahoma, 348 U.S. 483 (1955). Application of this test to the facts before this court compels the conclusion that the defendants have not violated Susan’s substantive due process or equal protection rights under the federal constitution.
Susan admits, as she must, that the state has a legitimate interest in assuring a safe environment in public schools. She contends, however, that expulsion was so “disproportionate” to her misconduct as to render it unconstitutional. Suspension or, at least, the provision to her of alternate education, was the only “appropriate” penalty for her transgression, Susan urges.
The Legislature in Section 37H expressly placed in the hands of the school principal and superintendent the choice between suspending and expelling students who possess dangerous weapons in school and who thereby put at risk the safety of the school environment. The Legislature struck the balance between a safe school environment and an individual’s right to public education in Section 37H by allowing suspension rather than expulsion as penalty for weapons violations only when the principal could opine that the violator did not pose a threat to others. It is a balance within the authority of the Legislature to strike, even if not one with which all would agree or deem wise. The statute withstands rational basis scrutiny both on its face and as applied to Susan.
The Supreme Court has “repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials ... to prescribe and control conduct in the schools." Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 507 (1969) (citations omitted). The Court has clearly established that the control of misconduct in the public school systems of the United States “necessarily” depends upon the discretion and judgment of school officials. Wood v. Strickland, 420 U.S. 308, 328 (1975). The use of expulsion is a rational means to prevent school violence. Hill v. Rankin County Miss. School District, 843 F.Supp. 1112, 1116 (S.D. Miss. 1993).
*340 Susan’s assertion that there was “literally no evidence on the record that Susan Parkins was dangerous to anyone,” misses the point. There was substantial evidence on which school officials reasonably decided to expel rather than suspend her: she brought a blade to school, she showed it to other students, she allowed them to handle it, she knew knives in school were prohibited, and she had a history of disciplinary infractions and emotional turbulence, including suicide attempts. Her expulsion was a reasonable attempt to protect other students and staff from potential violence.[19] Because her expulsion had a rational relationship to this particular end, it cannot be found to violate her substantive due process or equal protection rights under the United States Constitution.
C. Substantive Due Process and Equal Protection as Guaranteed by the Massachusetts Constitution (Counts VI, VII, VIII, X and XVI)
Susan raises numerous claims under the Massachusetts Constitution alleging that her fundamental right to education has been violated by the defendants’ actions. In Counts VI and VII, Susan alleges that the defendants’ actions were arbitrary and capricious in violation of her substantive due process rights because: (a) she was punished under an automatic expulsion policy; (b) the punishment was disproportionate to her misconduct; and (c) the defendants’ interpretation of Rule 8 so as to include the lipstick/knife at issue was unreasonable. She also contends in Count VIII that her due process rights were violated by the presumption of expulsion contained in Section 37H as it existed at the time of her expulsion. Finally, she contends in Count X that Section 37H, as applied and on its face, violates her equal protection rights because expulsion was not the appropriate discipline. It was, she argues, not the least restrictive alternative, when either suspension or alternative education were feasible.
The standard of review for Susan’s state constitutional claims, i.e. whether strict or minimum scrutiny is to be applied, is to be determined also by whether Susan’s claim involves a fundamental right. The threshold issue, then, is whether Susan has a fundamental right to an education under the Massachusetts Constitution.
1. The Right to an Education
Part II, c. 5, §2 of the Massachusetts Constitution (“Section 2” or “the Cherish Clause”) provides that “it shall be the duty of the legislatures and magistrates, in all future periods of this Commonwealth, to cherish the interests of . . . public schools and grammar schools in the towns . . .”[20] The Supreme Judicial Court has recently interpreted this clause to “impose an enforceable duty on the magistrates and Legislatures of this Commonwealth to provide education to the public schools for the children there enrolled, whether they be rich or poor and without regard to the fiscal capacity of the community or district in which such children live.” McDuffy v. Secretary of the Executive Office of Education, 415 Mass. 545, 621 (1993). The issue before the Court in McDuffy was whether the Massachusetts system of financing public education through local property taxes was constitutional. This system of financing had resulted in quite disparate levels of educational expenditures, program quality and educational opportunity as between wealthy and poor communities. The Court determined that the system of financing was unconstitutional, violating Section 2. Id.
Susan now urges this court to construe the Cherish Clause and McDuffy as standing for the broader proposition that she, as an individual, has a fundamental right to an education which she can enforce against the defendants. In support of this contention, she points to language in McDuffy that the Commonwealth has a “duty to provide an education for ail its children ...” This duty “is designed not only to serve the interests of the children, but, more fundamentally, to prepare them to participate as free citizens of a free State to meet the needs and interests of a republican government . . .” Id. at 606 (emphasis in original). Susan concludes from this that she has a fundamental right to be educated and that the defendants must provide it to her.
The issue before this court, however, is quite different from that which was decided in McDuffy. The Supreme Judicial Court was addressing in McDuffy the fact that many communities within the Commonwealth were not able to provide children with adequate educational opportunities under the extant system of school financing, contrary to the constitutional duty imposed on the Legislature under the Cherish Clause. In contrast, this case is that of an individual student who seeks to be provided a public education notwithstanding misconduct which resulted in its forfeiture.
The Court referred often in McDuffy to the great importance of providing an adequate education for all children. At the same time, the Court recognized at least impliedly that educational opportunities can be lost by individual students, i.e., some children will be expelled and will not receive an education. The Court quoted with approval its prior decisions affirming the power of the Legislature and school officials to exclude children who did not behave in a proper manner. “In a series of cases, this court has held that various actions of the Legislature accorded with the ‘public obligation to provide for general education.’ ” Id. at 602, quoting Nicholls v. Mayor & School Committee of Lynn, 297 Mass. 65, 68 (1937). The “General Court has taken jealous care’ to clothe ‘municipal officers with adequate authority to encourage the highest practicable efficiency of the system of public education’ and, therefore, the . . . school committee was fully empowered to issue and enforce a rule *341 forbidding public high school students from participating in secret societies.” Id. quoting Antell v. Stokes, 287 Mass. 103, 105-06 (1934). Thus, the McDuffy Court found no conflict between the duty to “cherish public schools” and the ability of school officials to expel students for disciplinary infractions. Otherwise put, McDuffy and a long line of cases which precede it suggest that the Legislature’s duty to provide an adequate public education to eligible students irrespective of economic circumstance encompasses the duty to provide a safe, orderly and effective learning environment. The educational opportunity provided to individuals can be forfeited by conduct which is deemed incompatible with an adequate educational setting serving the children of the Commonwealth.
Further support for this interpretation is found in Antell, in which the Court addressed an issue similar to that in the instant case. A school committee had adopted a rule prohibiting public school students from joining secret societies. The punishment for violation was expulsion. Antell, 287 Mass. at 104-05. Noting the broad power to regulate schools granted by the Legislature, the Court upheld the rule and the expulsion of students who had violated it. Id. at 107. In so doing, the Court stated, that “[n]o personal right stands superior to the public welfare in this particular.” Id. at 108 (emphasis added).
This interpretation is hardly new. In Sherman v. Inhabitants of Charlestown, 62 Mass (8 Cush.) 160 (1851), albeit for reasons many would today deplore, the Court noted that “(o]n general principles, it would seem strange if, in the establishment of such a great public institution as that of the public schools, in the benefits of which the whole community has so deep and vital an interest, there were no power vested anywhere, sufficient to protect the schools thus established from the noxious influence of any one, whose presence and influence might be injurious to the whole, and subversive of the purposes manifestly contemplated by their establishment.” Sherman, 62 Mass. at 163 (emphasis added). The Legislature endowed school officials with the power to expel students because “these schools are established for the benefit of all the inhabitants. The enjoyment of this benefit is therefore a common, not an exclusive personal right; . . . like other common rights,... it must be exercised under such limitations and restrictions, that it shall not interfere with the equal and coextensive rights of others.” Id. at 164.
In light of the foregoing, the court concludes that Susan does not have a fundamental right to an education in the sense asserted. The right which Susan does have is that of an equal opportunity to an adequate education, a right which she may lose by conduct seen to be detrimental to the community as a whole. The Legislature has made plain that school officials may exclude students such as Susan who violate school rules which proscribe weapons possession in school. It is not difficult to see how such rules further the welfare of the school community.
Susan’s contention that her fundamental right to an education under Part II, c. 5, §2 includes the right to alternative education after she has been expelled requires separate discussion. She asserts that she is entitled to be provided with an alternative public education program, specifically mentioning home education or tutoring as acceptable to her. To be sure, these claims are the most troubling and problematic of Susan’s contentions. Worcester does not choose to provide alternative education for students like Susan. Susan’s education is thus at an end at the age of 15 unless she is readmitted this November or thereafter.
McDuffy articulates quite clearly that education is and has long been a fundamental concern of our Commonwealth and that an educated citizenry is critical to our system of democratic government. Without an adequate system of education, society cannot thrive. The underlying rationale for the McDuffy mandate that the school financing system be revamped was based squarely upon the needs of the community. However, Susan and other students who run afoul of school rules also have the individual need to be educated. “In our increasing technological society, getting at least a high school education is almost necessary for survival. Stripping a child of access to educational opportunity is a life sentence to second class citizenship unless the child had the financial ability to migrate to another school system or enter private school.” Lee v. Macon County Board of Education, 490 F.2d 458, 460 (5th Cir. 1974).
Susan is a troubled adolescent with serious personal and family problems. Her demeanor at trial — her dark clothing, seemingly black nail polish, reed-thin wraith-like appearance, understandable anxiety and quiet, tentative manner — was entirely consistent with the other information which emerged at trial about her and simply underscored the neediness of this child. In her quest for attention and assistance, she made a grave mistake in judgment which resulted in her expulsion from school. It is not the expulsion itself which is so much the difficulty in this case; it is the fact that no alternative public education exists for Susan. It is the fact that Susan’s education may now permanently be at an end which is troubling beyond measure.
Notwithstanding the great desirability of municipal provision of alternative education for students in Susan’s situation, this court is unable to mandate it. Both McDuffy and the slightly more recent Supreme Judicial Court decision, Board of Education v. School Committee of Quincy, 415 Mass. 240 (1993), constrain this court to find that it is constitutional and not unlawful for the Worcester Public Schools to expel Susan and yet not provide her with any alternative education. The Supreme Judicial Court has stated plainly that it is the responsibility of the Legislature *342 and not the courts to determine what if any alternative education shall be provided to students like Susan.
In Quincy, the Board of Education sued the municipality for not providing an alternative education to a student who had been expelled for bringing a weapon to school. Board of Education, 415 Mass. at 240. The claims raised were statutory in nature and no constitutional issues were before the Court. Id. However, the Court specifically noted that “(i]t is for the Legislature, not the courts and not the board, to determine whether and in what manner alternative education must be provided for students expelled for disciplinary reasons.” Id. at 246 n.8. The Court stated that it is the Legislature which must address the unfairness of this result when compared to children who are committed to the Department of Youth Services as a result of having committed serious crimes yet who still receive educational services. “The disparity of treatment between the two groups of students ought to be brought to the attention of the Legislature in an attempt to prevail on it to address the issue of education for expelled students. The Legislature might well provide for some type of education program for those [expelled students].” Id. at 247-48 n. 10.
The directive of the Supreme Judicial Court is thus clear. A student who is expelled from school does not have a fundamental right to alternative education. This court is accordingly powerless to alter the tragic course of events which results in the abandonment by our educational system of troubled students like Susan.
2. Susan’s Contentions
Where as here no fundamental right is involved and the statute draws no inherently suspect distinctions, its validity must be judged by the lowest level of scrutiny, the rational basis test. Marshfield Family Skateland, Inc. v. Marshfield, 389 Mass. 436, 445 (1983). The standard is whether Section 37H “bears a real and substantial relation to the public health, safety, morals, or some other phase of the general welfare.” Id. quoting Sperry & Hutchinson Co. v. McBride, 307 Mass. 408 418 (1940). Under the rational basis test, the “person making the challenge has an onerous burden of proof in establishing the invalidity of the statute.” Commonwealth v. Henry’s Drywall Co., 366 Mass. 539, 542 (1974).
Susan contends that Boule and Garvey “in expelling and sustaining [her] expulsion were arbitrary and capricious in that the severe punishment was issued based on criteria other than the facts of the case.” I interpret this to mean that Susan believes she was disciplined under an alleged unofficial policy of automatically expelling students found to violate the weapons policy. As discussed in Section I.B., the court does not find that the school in fact had such a policy. However, even if there were such a policy and it were applied to Susan, it would withstand constitutional scrutiny. School officials may choose to mete out uniform punishment to students who violate a school rule. A policy that provides known and certain punishment for bringing a weapon to school has a “real and substantial relation” to the legitimate goal of deterring students from violating the rule.
Susan also contends that the defendants’ actions were “arbitrary and capricious in that the punishment imposed was grossly disproportionate under the circumstances” and that she should have been suspended, not expelled. Susan knowingly brought what the principal and superintendent reasonably found to be a knife to school. She took the lipstick/knife out in the middle of a class and displayed it to fellow students. It is reasonable and rational for school officials to determine that Susan should be expelled as a means of insuring school safety.
Susan further contends that the defendants’ interpretation of Rule 8 as including the lipstick/knife was arbitrary and capricious. The weapons policy provided that “a student who is found on school premises in possession of a dangerous weapon, including, but not limited to, a gun or a knife may be subject to expulsion from the school by the principal regardless of the size of the knife." The object which Susan brought to school had a very sharp tip and it could certainly cause serious damage to a person if used to stab or slash that person whether in jest, by mistake or on purpose. It is sharply pointed enough to put out an eye or create a puncture wound at least an inch deep. The lipstick/knife was reasonably found to be a dangerous weapon in the school context, where school authorities have little justification for waiting for a third person to be hurt before removing a harmful object or the student who brought it. The fact that the lipstick/knife appears so innocuous from the outside does not make its contents any the less dangerous.
Susan also contends that the presumption of expulsion in Section 37H violates her substantive due process rights. She argues that Section 37H impermis-sibly burdens her educational rights “by making it more difficult for a principal and a superintendent to retain a student in school who has violated the terms of [Section] 37H, in that the statute requires written findings for decisions not to expel but does not for decisions to expel.”
Essentially, Section 37H requires principals to recommend that students who bring weapons to school be expelled. This burden must be analyzed under the minimum scrutiny test. It is presumed by the statute that students who bring weapons to school will be expelled rather than suspended. This, in and of itself, bears a “real and substantial" relationship to the legitimate goal of making schools free of weapons. That the Legislature has allowed a small “escape hatch” for students whom the principal believes cure not “a threat to the safety, security and welfare of other students and staff in the school” is also rational. G.L.c. 71, §37H(e). The Legislature may rationally place upon the *343 principal and, in the end, the student the burden of proving that the student is not a threat to others despite his/her serious misconduct. That a student who brings a weapon to school is presumed to be a threat to others is surely rational, as is the exception allowed by the Legislature when the presumption is, as it were, rebutted. Susan’s substantive due process rights under the Massachusetts Constitution were accordingly not violated by the application of Section 37H.
E. Void for Vagueness (Counts IV and V)
Susan contends that, if the lipstick/knife is a “dangerous weapon” under Section 37H, then the statute is unconstitutionally vague and its application to her violates Susan’s due process rights as guaranteed by Pt. I, Art. X of the Massachusetts Declaration of Rights and the Fourteenth Amendment of the United States Constitution.[21],[22]
According to the view advanced by Susan, if Section 37H leaves the definition of “dangerous weapon” to school administrators, instead of relying on the limited definition contained in G.L.c. 269, §10(b), “then each school district throughout the Commonwealth may apply its own definition to the term and students may receive different treatment and discipline for the same object possessed on school grounds.” Susan contends that the statute grants “unlimited” discretion to school officials and “leavefs] open the possibility of each student having to guess as to what objects possessed could lead to discipline.” This, she alleges, severely burdens her substantial interest in education under federal constitutional law and her fundamental right to education under state law. To avoid this problem, she offers the criminal definition of dangerous weapons as discussed above in Section I.C.
A law is void for vagueness if persons “of common intelligence must necessarily guess at its meaning and differ as to its application.” Caswell v. Licensing Commission for Brockton, 387 Mass. 864, 873 (1983), quoting Connally v. General Construction Co., 269 U.S. 385, 391 (1926). Vague laws violate due process because individuals do not receive fair notice of the conduct proscribed by a statute and because vague laws which do not limit the exercise of discretion by officials create the possibility of arbitrary and discriminatory enforcement. Caswell, 387 Mass. at 873 (citations omitted). A law is unconstitutionally vague and denies due process of law if it fails to provide a reasonable opportunity for a person of ordinary intelligence to know what is prohibited or if it does not provide explicit standards for those who apply it. Commonwealth v. Jasmin, 396 Mass. at 655.
The degree of permissible vagueness varies with the interests involved. Id. The test is less strict when the law involves economic regulation and “does not inhibit the exercise of constitutionally protected rights.” Id, “(V)agueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand.” Davis, petitioner, 383 Mass. 645, 647 (1981), quoting United States v. Mazurie, 419 U.S. 544, 550 (1975). Similarly, statutes which do not define or relate to criminal conduct need not be drawn as precisely as statutes that touch upon criminal acts. Caswell, 387 Mass. at 873.
Section 37H provides clear direction that students are not allowed to bring knives or guns onto school property. “(A)ny student found ... in possession of a dangerous weapon, including but not limited to, a gun or a knife . . . may be subject to expulsion.” G.L.c. 71, §37H. The term “knife” is generic and commonly used and understood. A “law is not vague ... if it requires a person to conform his conduct to an imprecise but comprehensive normative standard so that men of common intelligence will know its meaning.” Commonwealth v. Taylor, 413 Mass. 243, 248 (1992), quoting Commonwealth v. Orlando, 371 Mass. 732, 734 (1977).
Susan, as a student with common intelligence, understood the consequences of her actions, particularly with the aid of Rule 8 of North High which clarified that knives of all lengths were proscribed. She brought a knife to school where it was plainly prohibited. While she may not have intended the consequences, she did intend to act. The statute is not unconstitutionally vague as a measure intended to preserve safety in public schools. See Wood v. Strickland, 420 U.S. 324, 324-25 (1975) (school officials do not need to use statutory definition of intoxicating liquor in interpreting school prohibition against possession of intoxicating beverages). There is no need to import other statutes or case law to make clear that which is already constitutionally acceptable.
F. Civil Rights Claims
In light of the foregoing decision, Susan’s claims for damages under G.L.c. 12, §111 and 42 U.S.C. §1983 are unsuccessful. She has not proven that the defendants’ actions deprived her of a federal constitutional or statutory right. Willhauck v. Halpin, 953 F.2d 689, 703 (1st Cir. 1991), citing Golden State Transit Corp. v. Los Angeles, 493 U.S. 103, 105-08 (1989). Susan also has not shown a state constitutional right which the defendants interfered with “by threats, intimidation or coercion.” G.L.c. 12, §11H.
ORDER
It is hereby ORDERED that judgment enter for the defendants on all counts.

 The School Committee is responsible for expelling students under G.L.c. 76, §17. Under the Education Reform Act, *344 St. 1993, c. 71, however, the Legislature reduced the administrative role of the School Committee, investing in school principals and the superintendent the power to expel students in certain circumstances, specifically in weapons and drugs cases.

 The governing statute was G.L.c. 76, §17 which provided then (and now) that “[a] school committee shall not permanently exclude a pupil from the public schools for alleged misconduct without first giving him and his parent or guardian an opportunity to be heard.” If the school committee decided to expel the student, it had to make written findings. G.L.c. 76, §16.

 On July 1, 1994, the Legislature amended this paragraph by striking it and inserting in its place the following: “After said hearing, a principal may, in his discretion, decide to suspend rather than expel a student who has been determined by the principal to have violated either paragraph (a) or (b).” St. 1994, c. 51. This changed statutory language has no bearing on the issues presently before this court because Susan was expelled prior to its enactment. The parties have not raised or briefed the issue of the possible retroactive application to Susan of the changed statutory language.

 Section 46G of G.L.c. 71 establishes the position of school adjustment counselor “(t]o facilitate the early detection of children manifesting traits tending toward juvenile delinquency and to assist in the prevention of such children becoming juvenile delinquents . . .” Seale’s duties include “cooperating with teachers, principals and all other school personnel assisting with adjusting such children.” G.L.c. 71, §46G.

 In deciding whether the discipline was lawful, no de novo judicial fact finding is required. Nicholas B. v. School Committee of Worcester, 412 Mass. 20, 23 (1992). Judicial review is based on the record before the principal and superintendent and is to determine whether school officials acted arbitrarily or capriciously. See id. Ajudicial hearing was held in this case because there were facts in dispute necessary for determining Susan’s constitutional claims.

 A student who violates disciplinary rules “especially after having made [an] express promise to obey them, may be excluded from the school by the school committee acting in good faith.” Antell v. Stokes, 287 Mass. 103, 107-08 (1934). There was no evidence that school officials were not acting in good faith and there was ample evidence to support the school officials’ decision to expel Susan for violating Rule 8.

 There are two different philosophies which underlie the enforcement of school disciplinary rules. One provides that the punishment for violation of disciplinary regulations must fit the misbehavior and be tailored to the pupil’s age, intelligence and personal history. The other favors consistency in the punishment of certain student misbehavior and calls for uniformity in the administrative response to certain well-defined problems. Either course is within a school’s discretion. See, e.g., Wood v. Strickland, 420 U.S. 308, 322-25 (1975) (use or possession of alcohol at school punished by suspension for balance of semester). Consistency in punishment is an acceptable method for a school system to deal with a problem even if it is a method which might be deemed harsh or imprudent in certain cases.

 While the defendants did expel each of the six students at North High for whom principal’s hearings were held during the 1993-1994 academic year, there was evidence at trial that another student merely had a weapon confiscated and his parents notified. He did not receive a hearing nor was he suspended or expelled for bringing a “fused ring” to school. The other confiscated weapons included knives of various sizes and a gun. Plaintiff did not persuade the court by sufficient evidence of the existence of a de Jacto automatic expulsion policy at the time of Susan’s expulsion.

 The Attorney General filed an amicus brief in support of Susan’s argument in this regard.

 Section 10(b) of G.L.c. 269 reads in pertinent part:
(b) [wjhoever, except as provided by law, carries on his person, or carries on his person or under his control in a vehicle, any stiletto, dagger, or a device or case which enables a knife with a locking blade to be drawn at a locked position, any ballistic knife, or any knife with a detachable blade capable of being propelled by any mechanism, dirk knife, any knife having a double-edged blade, or a switch knife, or any knife having an automatic spring release device by which the blade is released from the handle, having a blade of over one and one-half inches, or a sling shot, blowgun, blackjack, metallic knuckles or knuckles of any substance which could be put to the same use with the same or similar effect as metallic knuckles, nunchaku, zoobow, also known as klackers or kung fu sticks, or any similar weapon consisting of two sticks of wood, plastic or metal connected at one end by a length or rope, chain, wire or leather, a shuriken or any similar pointed starlike object intended to injure a person when thrown, or any armband, made with leather which has metallic spikes, points or studs or any similar device made from any other substance or a cestus or similar material weighted with metal or other substance and worn on the hand, or a manrikigusari or similar length of chain having weighted ends: or whoever, when arrested upon a warrant for an alleged crime, or when arrested while committing a breach or disturbance of the public peace, is armed with or has on his person, or has on his person or under his control in a vehicle, a billy or other dangerous weapon other than those herein mentioned and those mentioned in paragraph (a), shall be punished by imprisonment for not less than two and one-half years nor more than five years in the state prison or for not less than six months nor more than two and one-half years in a jail or house of correction, except that, if the court finds that the defendant has not been previously convicted of a felony, he may be punished by a fine of not more than fifty dollars or by imprisonment for not more than two and one-half years in a jail or house of correction.

 Chapter 94C defines the various classes of drugs which may be illegal for individuals to possess.

 The federal claim also alleges this conduct was knowing and intentional, in violation of 42 U.S.C. §1983.

 The protection afforded property interests by both provisions is subject to the same analysis. Opinion of the Justices, 408 Mass. 1215, 1217 (1990); School Committee of Hatfield v. Department of Education, 372 Mass. 513, 515 n. 2 (1977).

 Susan claims these violations were knowing and intentional violations prohibited by 42 U.S.C. §1983.

 Susan’s arguments all center on her claim to a fundamental right to an education. She does not challenge any classification created by the statute which might require an intermediate heightened scrutiny.

 The opportunity to receive an education “where the state has undertaken to provide it, is a right which must be made available to all on equal terms.” Brown v. Board of Education of Topeka, 347 U.S. 483, 493 (1954). The Supreme Court in Brown thus held that where a state chooses to provide citizens with a public education, the Equal Protection Clause requires that such education be provided equally to all citizens. Brown does not establish that states have a constitutional obligation to provide public education. However, a student may have a property interest in receiving a public education such that a state which has chosen to provide public education “may not withdraw that right on grounds of misconduct absent fundamentally fair procedures to determine whether the misconduct has occurred.” Goss v. Lopez, 419 U.S. 565, 574 (1975). Still, the Supreme Court has not recognized a constitutionally *345 protected property interest in an education absent a state’s choice to provide one.

 As the Supreme Court has stated, it is not for the courts to set aside decisions of school administrators which the Court may view as “lacking a basis in wisdom or compassion. ” Wood, 420 U.S. at 326.

 Section 2 of Part II, c. 5 provides in full:
Wisdom and knowledge, as well as virtue, diffused generally among the body of the people, being necessary for the preservation of their rights and liberties; and as these depend on spreading the opportunities and advantages of education in the various parts of the country, and among the different orders of the people, it shall be the duty of legislatures and magistrates, in all future periods of this Commonwealth, to cherish the interests of literature and the sciences, and all seminaries of them; especially the university at Cambridge, public schools and grammar schools in the towns; to encourage private societies and public institutions, rewards and immunities, for the promotion of agriculture, arts, sciences, commerce, trades, manufactures, and a natural history of this country; to countenance and inculcate the principles of humanity and general benevolence, public and private charity, industry and frugality, honesty and punctuality in their dealings; sincerity, good humor, and all social affections, and generous sentiments among the people.

 Susan also claims this was knowing and intentional conduct in violation of 42 U.S.C. §1983.

 The analysis under the two provisions are identical. Commonwealth v. Jasmin, 396 Mass. 653, 655 (1986).