BOARD OF EDUCATION & another[1]
*vs.* SCHOOL COMMITTEE OF QUINCY & others.[2]

Suffolk. January 7, 1993. - May 12, 1993.

Present: LIACOS, C.J., WILKINS, ABRAMS, NOLAN, & GREANEY, JJ.

*Education. School and School Committee*, Enforcement of discipline.

The Board of Education did not have statutory authority to require a
    school committee to provide an alternative educational program for a
    child properly expelled from a public school. [243-247]

CIVIL ACTION commenced in the Supreme Judicial Court
for the county of Suffolk on July 6, 1992.

The case was reported by *Wilkins*, J.

*Judy A. Levenson*, Assistant Attorney General, for the
plaintiffs.

*James S. Timmins*, Assistant City Solicitor, for the
defendants.

ABRAMS, J. The Board of Education (board) commenced
an action for declaratory and injunctive relief in the Supreme
Judicial Court for Suffolk County, seeking a declaration
that, under G. L. c. 76 (1990 ed.), the school attendance
statute, the school committee of Quincy must offer alterna-
tive education to an expelled student. The board also seeks a
declaration that it has the statutory authority to order the
school committee to provide that alternative education. See
G. L. c. 15, § 1G (1990 ed.).[3] The parties filed a statement
of agreed facts. A single justice reserved and reported the
case to the full court. For the reasons stated in this opinion,

[1]The Commonwealth.

[2]The mayor of Quincy, as an ex officio member of the school committee,
and the acting superintendent of the Quincy public schools.

[3]There are no constitutional issues before us.

on remand to the county court, a judgment shall be entered declaring that the board does not have the statutory authority to order a school committee to provide alternative education for a child properly expelled from a public school.

We set forth the agreed facts. "William F.[4] resides in Quincy, Massachusetts[,] with his mother, father and sister, and did so as of October, 1991. He attended the Quincy public schools from on or about December, 1990, until on or about October 23, 1991, when the principal of the Quincy High School suspended him for possessing a firearm on or near school premises. William, then a freshman at the High School, was fifteen years old at the time. His date of birth is July 23, 1976.

"On or about November 20, 1991, the School Committee voted to expel William permanently from the Quincy High School.

"The School Committee has not provided William with any educational services, such as home tutoring or programs outside the regular classroom, since his expulsion, despite requests for such alternative educational services by William and his family.

"On or about December 2, 1991, a member of William's family filed a complaint on his behalf with the Bureau of Student Development and Health of the Massachusetts Department of Education (DOE) based on the School Committee's decision not to provide William with educational services. The DOE is supervised and controlled by the Board pursuant to G. L. c. 15, § 1.

"The Board interprets G. L. c. 76, §§ 1 et seq., to require school committees to provide a public education to all children between the mandatory school attendance ages of six (6) and sixteen (16), including students who have been excluded from a public school setting for disciplinary reasons. The Board further interprets the law to require that excluded students between those ages be provided with alternative educational services, such as home tutoring or programs

---

[4]The name William F. is a pseudonym.

outside the regular classroom. By letter dated December 30, 1991, the DOE advised the Quincy School Superintendent of the Board's position and urged the School Committee to reconsider its decision to deny all educational services to William since his expulsion.

"The School Committee's estimated cost for providing home tutoring to William for the 1991-1992 academic year was between Four Thousand Dollars ($4,000) and Five Thousand Dollars ($5,000). The Quincy school system reported to the DOE that the per pupil expenditure for students attending regular day programs in the Quincy public schools was Five Thousand One Hundred Seventeen Dollars ($5,117) during the 1990-1991 academic year.

"Despite communications among the DOE, the Superintendent and the Quincy School Committee, the defendants have continued to refuse to provide William with any educational services since his expulsion.

"The Board requested, pursuant to G. L. c. 15, § 1G (¶ 24), that the Attorney General initiate action on its behalf to require the Quincy School Committee to comply with the compulsory education statute, as construed by the Board. . . .

"Pursuant to the disposition of a juvenile proceeding instituted against William with respect to the October, 1991 charge against him for possessing a firearm, William must complete one year of juvenile probation. Prior to this incident, he had no juvenile record.

"Following his expulsion from the Quincy High School, William attempted unsuccessfully to be admitted to both a private, parochial school and a public high school in another city. When neither attempt succeeded, William's parents required him to stay at home during school days and would not allow him to leave his house unaccompanied by an adult for fear that he would get into trouble by associating with other children not attending school.

"William would like to earn his high school diploma and attend college. Because his father works for Boston College

as a janitor and a waiter, William will be eligible for a reduced or waived tuition if he is admitted to Boston College.

"School systems throughout the Commonwealth of which the Board is aware, including, without limitation, those in Boston, Bourne, Brookline, Danvers, Holyoke, Peabody, Marblehead, Somerville, Springfield and Westport, have offered or provided home tutoring or other alternative educational programs to children between the ages of six (6) and sixteen (16) who have been excluded from a public school setting for disciplinary reasons.

"Children between the ages of six (6) and sixteen (16) (and older) who have been adjudicated delinquent and committed to the Massachusetts Department of Youth Services (DYS) receive comprehensive educational services provided by DYS within a DYS facility."

The board argues that one of the legislative intentions in enacting a compulsory attendance statute is to require that school committees educate all children of compulsory education age.[5] The board argues that it consistently has interpreted G. L. c. 76 to require school committees to provide alternative educational opportunities for all children, including those who have been expelled. The board asserts that, because it is the agency charged with overseeing compliance with G. L. c. 76, see G. L. c. 15, §§ 1 and 1G, therefore its interpretation of the statute should be given some deference.

We agree with the board that reasonable and consistent interpretations of statutes, by agencies charged with their implementation, are entitled to deference. *Connery* v. *Com-*

---

[5]In pertinent part, G. L. c. 76, § 1 (1990 ed.), provides: "Every child between the minimum and maximum ages established for school attendance by the board of education . . . shall, subject to [§ 15], attend a public day school in said town, or some other day school approved by the school committee, during the number of days required by the board of education in each school year, unless the child attends school in another town, for said number of days, under [§§ 6 to 12], inclusive, or attends an experimental school project established under an experimental school plan, as provided in [§ 1G] of [c. 15]. . . . The school committee of each town shall provide for and enforce the school attendance of all children actually residing therein in accordance herewith."

*missioner of Correction*, 414 Mass. 1009 (1993). See *Boyl-ston Dev. Group, Inc.* v. *22 Boylston St. Corp.*, 412 Mass. 531, 539 (1992), quoting *Boston Neighborhood Taxi Ass'n* v. *Department of Pub. Utils.*, 410 Mass. 686, 692 (1991) ("[a] reviewing court must 'accord due weight and deference to an agency's reasonable interpretation of a statute within its charge' "). Deference does not mean abdication. See *Warcewicz* v. *Department of Envtl. Protection*, 410 Mass. 548, 550 (1991). "The duty of statutory interpretation is for the courts." *Connery* v. *Commissioner of Correction, supra* at 1010, quoting *Cleary* v. *Cardullo's, Inc.*, 347 Mass. 337, 344 (1964).

The school committee of Quincy (school committee) contends that G. L. c. 76 simply directs local school committees to ensure that all children of the proper ages attend school. The school committee points to language in various sections of the statute as support for its position that G. L. c. 76 is predominantly a compulsory attendance law, which does not require that the school committee provide an educational alternative to a student who has been properly expelled for disciplinary reasons. We agree.

General Laws c. 76 indicates that the Commonwealth's interest is "ensuring that the children residing within the State receive an education." *Care & Protection of Charles*, 399 Mass. 324, 336 (1987). As we read G. L. c. 76, it is a compulsory attendance law. *Attorney Gen.* v. *Bailey*, 386 Mass. 367, 373, cert. denied, 459 U.S. 970 (1982). At issue is whether the Legislature intended to require a local school committee to provide an alternative education to a properly expelled child based on the compulsory attendance statute. We turn to the statute to determine whether, read as a whole, it supports the board's interpretation. See *Telesetsky* v. *Wight*, 395 Mass. 868, 872-873 (1985).

General Laws c. 76 is titled "School Attendance." The first section sets out who must attend the public school and the exceptions from attendance requirements. G. L. c. 76, § 1. It also obligates the school committee of each town to "provide for and enforce the school attendance of all children

actually residing" in that town. *Id.* Section 1 of the statute also lists some categories of children who are exempted from the requirement to attend school. *Id.*[6] Expelled children are not included in the list of exceptions.

The statute fines those who unlawfully prevent a child from attending school. G. L. c. 76, §§ 2, 4. It also authorizes the attendance of nonresidents and considers the financial responsibility for such attendance. *Id.* at §§ 3, 6-12, 12B-14. In addition, it prohibits discrimination and permits school committees to devise attendance plans that will eliminate racial imbalance. *Id.* at §§ 5, 12A. Section 16 requires that, if a school committee refuses to admit or excludes a pupil, it must furnish a written reason for its actions. If that reason is unlawful, "such pupil may recover from the town . . . in tort." G. L. c. 76, § 16. Section 17 prohibits a school committee from excluding a child from the public school "without first giving him and his parent or guardian an opportunity to be heard."

The statute, read as a whole, addresses only who shall attend school and where. It does not consider curriculum, student performance, discipline, or teacher qualifications. It does not include a specific requirement that a school committee provide an educational alternative to an individual child who is excluded from the public school for disciplinary reasons. General Laws c. 76 does not indicate a legislative intention that local school committees must make such educational alternatives available. We therefore turn to the board's statutory power.

The Legislature did not invest the board with the power to require the school committee to provide an educational alternative for a properly expelled student. See G. L. c. 15,

---

[6]The exceptions are for children between the ages of fourteen and sixteen who are working at certain jobs, or whose physical or mental conditions prevent attendance. G. L. c. 76, § 1. The statute also explains that, absent immunization and vaccination, children generally will not be admitted to public school. *Id.* at §§ 15, 15A.

§ 1G. Section 1G, in thirty-six paragraphs,[7] lists the purposes and duties of the board. The duties include, among others, responsibility for State-wide planning and development of educational innovations, the development of standards for budgeting, and the establishment of minimal educational standards, maximum pupil-teacher ratios, and nutritional standards. The board is also responsible for determining the efficacy of the State aid formula and may withhold State and Federal funds from school committees that fail to comply with the law governing the operation of schools. Section 1G does not give the board any authority over discipline matters; it does not authorize the board to interfere with or overrule the discipline imposed by a local school committee. Significantly, the board does not rely on its powers under G. L. c. 15, § 1G, to support its claim. The board, by requiring local school committees to provide alternative educational services to an expelled student,[8] exceeds its own statutory authority, see G. L. c. 15, § 1G, and intrudes on school committees' right to discipline students.

In contrast, local school committees do have the power to discipline students. *Nicholas B. v. School Comm. of Worcester*, 412 Mass. 20, 21 (1992) ("School committees have wide discretion in school discipline matters"). See G. L. c. 71, §§ 37, 37G, 37H. The Legislature has limited the disciplinary powers of the school committees, prohibiting corporal punishment, G. L. c. 71, § 37G, and requiring school committees to publish the rules of conduct for students. G. L. c. 71, § 37H. Section 37H also requires a school committee to address certain issues in its rules or regulations, including

---

[7]Statute 1992, c. 414, § 1, was approved on January 14, 1993, effective ninety days thereafter. It added a new paragraph after the fifteenth paragraph, thereby increasing the total number of paragraphs to thirty-seven.

[8]The board suggests that Quincy provide one-on-one tutoring for the child. A requirement of one-on-one tutoring could be viewed as providing a superior education for students who violate the disciplinary rules. It is for the Legislature, not the courts and not the board, to determine whether and in what manner alternative education must be provided for students expelled for disciplinary reasons.

"existing alternative education programs; procedures assuring due process for students in disciplinary proceedings; standards and procedures for suspension and expulsion of students; . . . and the disciplinary measures to be taken in cases involving the possession or use of illegal substances or weapons, the use of force, vandalism, or violation of other students' civil rights."[9] The Legislature thus determined that school committees, not the board, are the proper bodies for overseeing school discipline. Therefore, we conclude that on remand a judgment declaring that the board does not have the statutory authority to order the school committee of Quincy to provide an educational alternative to William F., who has been excluded permanently from Quincy High School, should be entered in the Supreme Judicial Court for Suffolk County.[10] The request for injunctive relief is denied.

*So ordered.*

[9]In July, 1992, the Legislature approved St. 1992, c. 133, § 430, which amended G. L. c. 71, § 37H. The amended paragraph now provides: "Each school committee's rules or regulations pertaining to the conduct of students shall include the following: *existing* alternative education programs; procedures assuring due process for students in disciplinary proceedings; standards and procedures for suspension and expulsion of students; procedures pertaining to discipline of students with special needs; standards and procedures to assure school building security and safety of students and school personnel; and the disciplinary measures to be taken in cases involving the possession or use of illegal substances or weapons, the use of force, vandalism, or violation of other students' civil rights. In cases involving the possession or use of weapons, the possession or use of illegal substances, the illegal possession of alcohol, or the use of excessive force, provided that the violation occurs on school property, the principal or headmaster of every school system within each city, town, or district shall have the authority to suspend a student, including an indefinite suspension, and no other disciplinary measure adopted as a rule or regulation may inhibit this authority to suspend. Where a student has been suspended by a principal or headmaster under the authority of the previous sentence, the school committee may review such suspension and alter the disciplinary measure after a hearing. Codes of discipline, as well as procedures used to develop such codes shall be filed with the department of education for informational purposes only."

[10]The board argues that, had William committed a more serious act or had a juvenile record, he might have been committed to the care and custody of the Department of Youth Services and would then be eligible for

educational services through DYS, whereas now he is entitled to none. It is unclear from the record whether students committed to DYS are placed in the public schools. The disparity of treatment between the two groups of students should be brought to the attention of the Legislature in an attempt to prevail on it to address the issue of education for expelled students. The Legislature might well provide for some type of educational program for those on probation.