490 S.E.2d 340

**CATHE A., Guardian of C.E.A., an infant under the age of 18 years, Petitioner Below, Appellee,**

**v.**

**DODDRIDGE COUNTY BOARD OF EDUCATION, Ronald K. Nichols, Superintendent; and William J. Curran, Martha M. Devericks, James J. Dukate, Clifford L. Willis and Monzel Rex Zickefoose, Individually and as a Member of the Doddridge County Board of Education, Respondents Below,**

**Doddridge County Board of Education, Appellant.**

**No. 23350.**

Supreme Court of Appeals of West Virginia.

Submitted Sept. 25, 1996.

Resubmitted Feb. 25, 1997.

Decided July 3, 1997.

Matthew W. Alexander, West Union, R. Clarke VanDervort, Payne, Loeb and Ray, Charleston, Michael A. Kawash, Robinson & McElwee, South Charleston, for Appellee.

Bethann R. Lloyd, Harry M. Rubenstein, Kay Casto Chaney Love & Wise, Morgantown, for Appellant.

Deborah L. McHenry, Managing Deputy Attorney General, Charleston, for the Attorney General, State of West Virginia.

Henry D. Hager, II, Alison Patient, Michael Crane, Charleston, for Amici Curiae West Virginia Legislature.

Darrell V. McGraw, Attorney General, Kelli D. Talbott, Senior Assistant Attorney General, Cynthia E. Evans, Special Assistant Attorney General, Charleston, for West Virginia, Dept. of Education and West Virginia Superintendent of Schools.

STARCHER, Justice:

The first issue which we address in this appeal by the Doddridge County Board of Education is whether the Productive and Safe Schools Act of 1995, which requires that children who bring dangerous weapons to school be removed from school for up to 12 months, violates the provisions of the *West Virginia Constitution* which make education a fundamental, constitutional right. Because the Act is narrowly tailored to serve a compelling state interest in safe and secure schools, we hold that the Safe Schools Act is facially constitutional.

The second issue presented in this appeal arises out of the Doddridge County Board of Education's decision to condition its providing four hours per week of educational instruction to a child who had been removed from school under the Safe Schools Act upon the child's parents paying the Board for the cost of the instruction. We affirm the judgment of the circuit court which held that the Board's action violated the provisions of the *West Virginia Constitution* which make education a fundamental, constitutional right.

## I.

### *Facts and Background*

During the 1994–95 school year, C.E.A.[1] attended Doddridge High School. Because of his disruptive conduct, he received discipline on nine occasions, ranging from warnings to suspension from school. On April 15, 1995, C.E.A. was found on school property with a heavy lock blade knife with a blade approximately three and one-half inches in length.

Although no discipline was administered for his possession of this formidable weapon, C.E.A. and his mother were warned that bringing the knife to school again would result in expulsion because the knife was considered a deadly weapon. Less than one month later, on May 9, 1995, while riding a school bus, C.E.A. was found with not one but two knives, both with blades three and one-half inches long.

Following C.E.A.'s immediate suspension, the Doddridge County Board of Education conducted a hearing on June 1, 1995. By a letter dated June 8, 1995, the Doddridge County Superintendent of Schools informed C.E.A. that as a result of the application of the Productive and Safe Schools Act, *W.Va. Code,* 18A–5–1a(g) [1995] ("the Safe Schools

1. Because this case involves a child and sensitive matters, we use the child C.E.A.'s initials. The underlying legal proceeding in this case was

Act" or "the Act"),[2] the Board of Education was expelling C.E.A. for a period of 12 consecutive months, ending May 8, 1996.

On October 10, 1995, C.E.A. (by his mother Cathe A.) filed a petition for writ of mandamus in the Circuit Court of Doddridge County seeking to compel the Board of Education either to readmit C.E.A. to regular school classes or alternatively to provide him with other state-funded educational services.

On October 23, 1995, a hearing on C.E.A.'s petition was held before the circuit court. The Board of Education stipulated that the Board was willing and able to provide a home instruction teacher for C.E.A. for four hours a week, but only if C.E.A.'s parents would agree to reimburse the Board for the cost of the teacher's time (including travel) at $14.00 per hour. The Board agreed to provide books and materials at no cost. The estimated cost to the Board was $45.00 per week.

On November 1, 1995, the circuit court issued a written order making findings of fact and conclusions of law. The order stated in part:

> The Doddridge County Board of Education has the legal duty under Article 12, Section 1 of the West Virginia Constitution, and under the principles of equal protection entailed in Article 3 of the State's Constitution, to provide C.E.A., from public funds, educational services and resources appropriate to his age, needs and academic status as a regular education student under expulsion.

The circuit court's order further stated:

A student's right to attend school facilities or to be present on school premises is not identical to a student's right to an education.... Forced ignorance, by failing for 12 months to provide a student with a publicly funded education, is not a rational or appropriate remedy for student misconduct regardless of the severity of such conduct.... [T]he principle of equal protection ... which requires local school boards to provide appropriate education services, at public expense, to students expelled from school is more compelling than an interpretation which would inevitably generate profoundly disparate results among expelled students depending on the financial means of their families.... [E]ducational services and resources [for C.E.A.] may be formulated and structured, in part, on the nature and degree of the risk to others generated by ... C.E.A.'s behavior.... [S]hould C.E.A. by his conduct, evidence a refusal to cooperate with and to accept the educational services which the local board is under a duty to provide, the Doddridge County Board of Education may terminate such services.

The circuit court concluded that the Board of Education's constitutional responsibility was not fulfilled either by merely providing C.E.A. with textbooks, or by providing educational services contingent upon reimbursement for their cost by C.E.A.'s family.

The circuit court also ruled that C.E.A.'s parents had to provide any necessary trans-

---

brought on the child's behalf by the child's parent, whom we refer to as Cathe A.

2. *W.Va.Code*, 18A–5–1a [1995] provides in relevant part:

> (a) A principal shall suspend a pupil from school or from transportation to or from the school on any school bus if the pupil, in the determination of the principal, after an informal hearing pursuant to subsection (d) of this section has: ... (ii) violated the provisions of subsection (b), section eleven-a, article seven, chapter sixty-one of this code; [§ 61–7–11a(b)] [felony to possess firearm or deadly weapon on school buses and school properties];

> \* \* \* \* \* \*

> (g) Pupils may be expelled pursuant to the provisions of this section for a period not to exceed one school year, except that if a pupil is determined to have violated the provisions of subsection (a) of this section the pupil shall be expelled for a period of not less than twelve consecutive months: Provided, That the county superintendent may lessen the mandatory period of twelve consecutive months for the expulsion of the pupil if the circumstances of the pupil's case demonstrably warrant....

The Act also mandates a 12–month suspension for assault and battery upon a school employee, and for the sale of narcotic drugs. *W.Va.Code*, 18A–5–1a (i) and (iii) [1995].

portation for C.E.A. The court denied C.E.A.'s request for attorney fees.

After the circuit court issued its ruling, the Board stated that it would provide C.E.A. four hours per week of state-funded instruction at a school building, after school hours. The Board reported this plan to the circuit court, which apparently found that the Board's plan was acceptable compliance with the court's directive. The Board then appealed the circuit court's order to this court. The appellee Cathe A. did not dispute the adequacy of the plan.

We granted the petition for appeal and heard argument on September 25, 1996. We subsequently ordered reargument and requested briefs from the Legislature, the State Board of Education and State Superintendent of Schools, and the Attorney General. After reargument on February 25, 1997, we issue this opinion.

## II.

### Discussion

#### A.

##### Mootness

■ Because the circuit court's order expired on May 8, 1996, with the end of C.E.A.'s expulsion, the issue of whether the circuit court's order was erroneous is technically moot. Our standard for choosing to review moot decisions is stated in Syllabus Point 1 of *Israel v. West Virginia Secondary Schools Activities Comm'n*, 182 W.Va. 454, 388 S.E.2d 480 (1989):

> Three factors to be considered in deciding whether to address technically moot issues are as follows: first, the court will determine whether sufficient collateral consequences will result from determination of the questions presented so as to justify relief; second, while technically moot in the immediate context, questions of great public interest may nevertheless be addressed for the future guidance of the

bar and of the public; and third, issues which may be repeatedly presented to the trial court, yet escape review at the appellate level because of their fleeting and determinate nature, may appropriately be decided.

This case presents this Court with an opportunity to consider the constitutionality of the Safe Schools Act, both facially and as applied. Each of the three factors recited in *Israel* are extant, thereby permitting us to address the important issues presented, regardless of the mootness of the claims raised by the parties to this appeal.

#### B.

##### Standard of Review

■ A circuit court's granting of relief through the extraordinary writ of mandamus is reviewed by an appellate court *de novo.* *Staten v. Dean*, 195 W.Va. 57, 464 S.E.2d 576 (1995). Our appellate review of a circuit court's interpretation of the *West Virginia Constitution* is also *de novo*. *Randolph Co. Bd. of Educ. v. Adams*, 196 W.Va. 9, 467 S.E.2d 150 (1995).

#### C.

##### The Safe Schools Act—Facial Constitutional Analysis

■ Syllabus Point 3 of *Pauley v. Kelly*, 162 W.Va. 672, 255 S.E.2d 859 (1979), states:

> The mandatory requirements of "a thorough and efficient system of free schools" found in Article XII, Section 1 of the West Virginia Constitution, make education a fundamental, constitutional right in this State.

Syllabus Point 6, *Randolph County Bd. of Educ. v. Adams*, 196 W.Va. 9, 14, 467 S.E.2d 150, 155 (1995); Syllabus Point 1, *State ex rel. Board of Education for Grant County v. Manchin*, 179 W.Va. 235, 366 S.E.2d 743 (1988).[3]

■ "[I]f the state takes some action which denies or infringes upon a person's

---

**3.** West Virginia recognizes that education is a fundamental, constitutional right under *W.Va. Const.* art XII, sec. 1. Although the United States Supreme Court has not found a fundamental, constitutional right to education under the United States *Constitution* (*see San Antonio Indepen-*

*dent School Dist. v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973)), the Supreme Court in *Brown v. Bd. of Educ. of Topeka*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed.2d 873 (1954) acknowledged the importance of education to

fundamental right to an education, then strict scrutiny will apply and the State must prove that its action is necessary to serve some compelling State interest. Furthermore, any denial or infringement of the fundamental right to an education for a compelling State interest must be narrowly tailored." *Phillip Leon M. v. Greenbrier County Board of Education,* 199 W.Va. 400, 409, 484 S.E.2d 909, 918 (1996) (McHugh, J., concurring, in part, and dissenting, in part) (citations omitted). For example, in Syllabus Point 4 of *Pauley v. Kelly, supra* we determined that any discriminatory classification in the school financing system must serve a compelling state interest.

In *Phillip Leon M., supra,* we held that providing a safe and secure environment wherein our children can learn is implicit in the constitutional guarantee of a "thorough and efficient school system" under *W.Va. Const.* art XII sec. 1. Syllabus Point 4 of *Phillip Leon M.* states, in pertinent part:

> Implicit within the West Virginia constitutional guarantee of "a thorough and efficient system of free schools" is the need for a safe and secure school environment. Without a safe and secure environment, a school is unable to fulfill its basic purpose of providing an education.

Well before the passage of the Safe Schools Act, this Court recognized that a child may be constitutionally removed from the classroom environment when he or she engages in disruptive conduct. In *Keith D. v. Ball,* 177 W.Va. 93, 350 S.E.2d 720 (1986), four pupils were expelled for a period of one calendar year based on their conduct of falsely reporting over two dozen bomb threats. We held in *Keith D.* that the pupils were not entitled to reinstatement because the pupils' behavior involved substantial disorder and invasion of the rights of others.[4] We stated:

> Conduct by a student, whether in class or out, whether it stems from the time, place, or type of behavior, which materially disrupts classwork or involves substantial disorder or invasion of the rights of others, is not constitutionally immunized. *See, e.g., Tinker v. Des Moines Indep. Community School Dist.,* 393 U.S. 503, 513, 89 S.Ct. 733, 740, 21 L.Ed.2d 731(1969) (First amendment); *see generally* Annot., 32 A.L.R.3d 864, 868 (1970). An individual does not have the right to exercise his fundamental constitutional rights at all times, under all circumstances, and by all methods.

177 W.Va. at 95, 350 S.E.2d at 722–23 (1986) (footnote omitted).

The United States Supreme Court has recognized that if forbidden conduct would materially and substantially interfere with the requirements of appropriate discipline in the

---

our children's future. The Supreme Court stated:

> [E]ducation is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms.

*Brown v. Bd. of Educ. of Topeka,* 347 U.S. at 493, 74 S.Ct. at 691, 98 L.Ed.2d at 880; *see also Plyler v. Doe,* 457 U.S. 202, 221, 102 S.Ct. 2382, 2396–97, 72 L.Ed.2d 786 (1982); *Wisconsin v. Yoder,* 406 U.S. 205, 221, 92 S.Ct. 1526, 1536, 32 L.Ed.2d 15 (1972).

Regardless of the Supreme Court's refusal to recognize education as a fundamental right, the *West Virginia Constitution* protects education beyond the comparable federal constitutional standards. *Cf. Adkins v. Leverette,* 161 W.Va. 14, 20, 239 S.E.2d 496, 499 (1977) (holding that this state can interpret our own constitution to require higher standards than afforded by comparable federal constitutional standards).

4. In Syllabus Point 4 of *Phillip Leon M.,* we modified the holding of *Keith D.,* by clarifying that the opinion in *Keith D.* was limited to the issue of whether the constitutional right to an education required reinstatement *to regular school classes* for disorderly and disruptive students—and not the issue of what degree and type of obligation the constitutional right to an education placed upon the state, in the case of students who had been permissibly removed from the regular school setting. *Phillip Leon M.,* 199 W.Va. at 407, 484 S.E.2d at 916.

operation of the school, the discipline may be sustained. *Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503, 509, 89 S.Ct. 733, 737–38, 21 L.Ed.2d 731 (1969); *Burnside v. Byars*, 363 F.2d 744, 749 (5th Cir.1966). The same reasoning would apply to consideration of the Safe Schools Act.

The 12–month expulsion period which the Safe Schools Act sets forth may seem to be a severe penalty. But the Legislature is entitled to believe that only such a penalty would serve as an effective deterrent to further the important goal of a strict weapons-free environment in our schools, and would remove those children who defied a "no weapons" policy from school for a substantial period of time.[5]

If West Virginians cannot have a reasonable degree of confidence that the schools that their children, grandchildren, nieces, nephews, friends and neighbors attend and work in are safe and secure, the survival of the "thorough and efficient" public school system which our *Constitution* itself mandates is in question. Indeed, a school system that did not take rigorous steps to eliminate violence and weapons could find itself in serious liability problems if a child or teacher were injured by the presence of conditions that the school could have detected and prevented. We conclude that the Safe Schools

Act's 12–month expulsion period[6] sends a strong message that we think the Legislature was entitled to believe *needs* to be sent to further a compelling state interest.

Because we conclude in Part II.D. of this opinion that in all but the most extreme cases a child who is on the receiving end of the Act's penalty will still have reasonable state-funded basic educational opportunities and services available, it is our judgment that the Safe Schools Act's requirement of removing children who commit certain offenses from a regular school setting for up to twelve months is narrowly tailored to serve a compelling state interest.

Because the State has a compelling interest in providing a safe and secure environment to the school children of this State pursuant to *W.Va. Const.* art. XII, section 1, and because expulsion from school for as much as 12 months pursuant to the provisions of the Productive and Safe Schools Act, *W.Va.Code*, 18A–5–1a(g)[1995] is a reasonably necessary and narrowly tailored method to further that interest, the mandatory suspension period of the Act is not facially unconstitutional.

### D.

#### *The Safe Schools Act—as Applied to C.E.A.*

The question now arises, if a child may constitutionally be removed from a regular

---

**5.** In considering the objectives of the Safe Schools Act, we recognize that the Legislature was properly concerned with providing our State's children and educational employees with a safe and secure environment in which to learn and work.

Additionally, we understand the context from which our state act arose. To encourage the various states to align themselves with the national campaign to establish a learning environment in our public schools free from violence and threats of violence, Congress used a "carrot and stick" approach. 20 U.S.C. § 5961 to 5968 [1994] ("Safe Schools Act of 1994").

The "carrot" is the continuation of federal funding for various State projects. The "stick" is the threat to withhold those funds if legislation on the state level does not address violence in our public schools. The Productive and Safe Schools Act of 1995 was West Virginia's response to the congressional encouragement.

Among the goals of the federal act are the achievement of violence-free schools by the year 2000 and the creation of a disciplined environment conducive to learning, thereby ensuring

that all schools are safe and free of violence. 20 U.S.C. § 5961(b). Congress, aware of the alarming increase in crime in our nation's schools, desired to create violence-free schools and this desire culminated in the passage of the "Gun Free Schools Act" in 1994. 20 U.S.C. § 8921(b)(1) [1994]. The Gun–Free Schools Act requires school districts to expel any pupil found possessing a gun at school, or risk losing federal funding under the Elementary and Secondary Education Act. The Gun–Free Schools Act encourages states to pass "zero-tolerance" statutes that mandate expulsion for pupils possessing guns at school.

**6.** We note that the 12–month expulsion period may be reduced in the discretion of the county superintendent. *W.Va.Code*, 18A–5–1a (1995) states that "the county superintendent may lessen the mandatory period of twelve consecutive months for the expulsion of the pupil if the circumstances of the pupil's case demonstrably warrant." Such a provision for reducing the expulsion period is permitted by the Gun–Free Schools Act, 20 U.S.C. 8921(b)(1) [1994].

school setting for 12 months, what then? Is the child to be left alone by the State with no obligation to engage in any sort of educational enterprise? What will be done to maximize the likelihood that the child keeps current with academic basics so that he or she can return to regular school not irreparably behind his or her peers?

These are difficult questions. The practical answers to these questions and the dilemmas they present will require experience, expertise, and experimentation. It is not the business of this Court to make detailed policy or prescriptions. However, in reviewing the circuit court's decision in the case of C.E.A., we can address the question of implementing the Safe Schools Act in a fashion that fully complies with the State's *constitutional* responsibility to provide safe and secure educational opportunities and services to all of the children of our State. Conscious of our limited but constitutionally necessary role, we proceed.

We begin by reiterating the narrow issue which was actually decided by the circuit court. The circuit judge held that the Board's proposal to provide C.E.A. with *four hours a week* of state-funded instruction at a school building after regular school hours would satisfy the Board's constitutional obligation to provide basic educational opportunities and services to C.E.A. Moreover, C.E.A.'s parents had to provide transportation, and if C.E.A. did not take advantage of the Board's proposal, the Board's responsibility to C.E.A. was ended. The appellee Cathe A. has not challenged the circuit court's ruling as to the constitutional adequacy of the opportunities and services contained in the Board's proposal, so this Court need not and does not address that issue.

However, the Board contends that the circuit court was wrong in requiring the Board to provide *any* state-funded educational opportunity to C.E.A.

We emphasize that at no time has the Board contended that the *safety* of a home

instruction or other after-school teacher for C.E.A. is or was an issue. The sole issue presented to the circuit judge was whether the Board could constitutionally make providing an instructional program for C.E.A. contingent upon the child's parents reimbursing the Board for the cost of the program.

The circuit court concluded that the ability or willingness of C.E.A.'s parents to reimburse the State for the cost of state-provided educational opportunities and services for a child who is removed from school pursuant to the Safe Schools Act was an impermissible factor in determining whether such a child is provided educational opportunities and services.

■ We do not discern that a compelling state interest is furthered in a narrowly tailored fashion by a policy of providing educational opportunities and services to children who are removed from school because of the Safe Schools Act only if their parents will reimburse the cost of the educational opportunity. Where the State is able to safely provide reasonable basic educational opportunities and services to a child who has been removed from regular school under the provisions of the Productive and Safe Schools Act, *W.Va.Code*, 18A–5–1a(g) [1995] there is no compelling state interest in a policy of providing the opportunities and services only if the child's parents are able and willing to reimburse the state for the cost.

■■ A child's constitutional, fundamental right to an education includes the right to be provided with educational opportunities and services (which may be restricted or limited by narrowly tailored restrictions necessary to achieve a compelling state interest) at public expense, without regard to the child or parents' ability or willingness to reimburse the state for the cost of the educational opportunities and services.[7] We agree with the circuit judge that equal protection concerns undermine the constitutional legitimacy of the State's making such a distinction in

---

7. The thoroughness and efficiency of the system of free schools in West Virginia cannot be ignored with an assertion that the State lacks ample means to provide education. *Kuhn v. Board of Educ.*, 4 W.Va. 499, 509 (1871); *State ex rel.*

*Board of Educ. v. Rockefeller*, 167 W.Va. 72, 281 S.E.2d 131 (1981). Rather, the education clause obligates the legislature to provide for the support of such schools. *Kuhn*, 4 W.Va. at 509.

providing educational opportunities and services.

The crafting of detailed procedures and standards for implementing the State's compelling interest in ensuring safe schools, while providing educational opportunities and services for all of our State's children as required by our *Constitution,* is a matter properly left to the legislative and executive processes.[8] However, such procedures and standards must pass the strict scrutiny and narrow tailoring that is required by our constitutional provisions governing the right to education.

In applying the mandate of the Safe Schools Act, the State Superintendent of Schools issued a memorandum on May 24, 1995, articulating a policy that a child who is removed from the classroom setting pursuant to the Safe Schools Act is not entitled to any form of state-funded instruction during the pendency of their expulsion. (The memorandum also stated that local educational agencies may in their discretion provide state-funded educational opportunities and services to these children.)

We are not unmindful of the enormous demands upon our State's educational system. We admire and praise the thousands of dedicated teachers, administrators, and service personnel who meet those demands with energy and creativity every day. Recognizing that our decision today will do nothing to reduce those demands, we must nevertheless conclude that the broad and sweeping policy set forth in the memorandum promulgated by the State Superintendent of Schools is incompatible with the place of education as a fundamental, constitutional right in this State.

 A policy to the effect that the State has *no* responsibility to provide *any* state-funded educational opportunities and services to *any* children who are expelled under the Productive and Safe Schools Act, *W.Va.Code,* 18A–5–1a(g) [1995] is constitutionally infirm because the State has not shown that applying such a limitation to *all* such children under *all* circumstances is reasonably necessary and narrowly tailored to further the compelling state interest in safe and secure schools.[9]

For the foregoing reasons, the circuit court's judgment that under the facts presented by this case, the provision of basic educational opportunities and services to a child expelled pursuant to the Safe Schools Act could constitutionally not be made dependent upon the parent's ability or willingness to reimburse the State is affirmed.

 For a child who is not permitted to attend normal school pursuant to the provisions of the Safe Schools Act, the extent and details of the State's constitutional responsibility to provide other state-funded educational opportunities and services to the child must be determined on a case-by-case basis, based on the unique circumstances of the individual child. A primary consideration in making such a determination must be the protection of students, teachers and other school personnel; another legitimate concern is the need to effectively deter other students from engaging in prohibited conduct.

 We recognize that in extreme circumstances and under a strong showing of necessity in a particular case, strict scrutiny and narrow tailoring could permit the effective temporary denial of all State-funded educational opportunities and services to a child

---

8. We note that pursuant to *W.Va.Code,* 18–5A–2(f) [1995], local school improvement councils are to develop guidelines for "the instruction and rehabilitation of pupils who have been excluded from the classroom, suspended from the school, *or expelled from the school . . . .*" (Emphasis added).

9. The total denial of state-funded educational opportunities and services to an expelled student is not required by the federal Gun–Free Schools Act, *see supra note* 4. Federal Department of Education policy provides that expulsion "at a minimum . . . means removal from the student's regular school program at the location where the violation occurred." (U.S. Department of Education, *Guidance Concerning State and Local Responsibilities Under the Gun–Free Schools Act of 1994,* 7 [1995]). Federal policy also explicitly permits students who are expelled to receive educational services that are clearly distinguishable from the student's regular school placement. *Id.*

removed from regular school under the Productive and Safe Schools Act, *W.Va.Code*, 18A–5–1a(g) [1995], particularly when the safety of others is threatened by the dangerous actions of a child, and where the child is unwilling or unable to utilize educational opportunities and services that are consistent with protecting the safety of others. *See Phillip Leon M. v. Greenbrier County Board of Education*, 199 W.Va. 400, 410, 484 S.E.2d 909, 919 (1996) (McHugh, J., concurring, in part, and dissenting, in part).[10]

Thus, to the extent that the opinion in *Phillip Leon M.* implies that "in *every case* in which a student is expelled from school for one year for possessing a firearm or other deadly weapon on school property, the State must provide an alternative education[,]"[11] *Phillip Leon M.*, 199 W.Va. at 410, 484 S.E.2d at 919, (McHugh, J., concurring, in part, and dissenting in part), that opinion is hereby modified.

We recognize that there may "be a point when a student's actions are so egregious, that in order to protect teachers and other school personnel [and, we add, other students], the State may determine that there is a compelling state interest not to provide an alternative to that particular expelled student." *Phillip Leon M.*, 199 W.Va. at 409,

484 S.E.2d at 919, (McHugh, J., concurring, in part, and dissenting, in part). However, the facts in the instant case and common sense suggest that in all but the most extreme cases the State will be able to provide reasonable state-funded educational opportunities and services to children who have been removed from the classroom by the provisions of the Safe Schools Act in a safe and reasonable fashion.[12] Under such circumstances, providing educational opportunities and services to such children is constitutionally mandated.

### E.

#### *Attorneys' Fees*

 The circuit court denied C.E.A.'s request for attorneys' fees and he appeals that determination. We review the denial of a request for attorneys' fees in a mandamus action under a clearly erroneous standard.

 We set out the standard for circuit courts to follow when determining whether to award attorneys' fees in a mandamus action in Syllabus Points 10 and 11 of *W. Va. Educ. Ass'n. v. Consolidated Pub. Retirement Bd.*, 194 W.Va. 501, 460 S.E.2d 747 (1995):

**10.** In *Phillip Leon M.*, Justice McHugh in his concurring and dissenting opinion (in which Chief Justice Workman joined) quoted from the thoughtful dissent by Chief Justice Liacos in *Doe v. Superintendent of Schools of Worcester*, 421 Mass. 117, 144–46, 653 N.E.2d 1088, 1103–04 (1995).

In his dissent, Justice Liacos differed with the majority and concluded that Massachusetts children do have a constitutional, fundamental right to education. He further concluded that in light of this constitutional right, when a child is removed from a school for violation of a "no weapons" policy, school officials who wish to deny all educational services to a child have the burden of making a "particularized showing" that "a procedure *could not be established* which would protect the safety of staff and students while permitting the education of [the child] … in some setting." *Id.* (Emphasis added).

**11.** We recognize that terms such as "alternative education" and "homebound instruction" which were generically used in *Phillip Leon M.* may be terms of art used to refer to specific programs in a school system. Such programs may, for example, be designed for children who are princi-

pally at academic risk or whose physical or other specific conditions prohibit attendance at a regular classroom setting. The constitutional requirement to provide reasonable educational opportunities and services at public expense to students who have been expelled for possessing weapons pursuant to the Safe Schools Act is not the same thing as requiring that the child be enrolled in the school system's existing "alternative education" or "homebound instruction," programs which have been developed for educational purposes other than responding to serious disciplinary problems.

**12.** The Legislature in its brief submitted in this case takes the position that in extreme cases and under a specific showing of necessity in a particular case, strict scrutiny and narrow tailoring could permit the effective temporary denial of all State-funded educational opportunity to a child expelled under the Safe Schools Act. The Legislature also takes the position that there must be "extremely rigorous standards" used in any determination that "a child is so dangerous that the State has a compelling interest in limiting his or her right to an education." We agree with these statements.

Where a public official has deliberately and knowingly refused to exercise a clear, legal duty a presumption exists in favor of an award of attorneys' fees and expenses unless extraordinary circumstances indicate an award would be inappropriate, then attorneys' fees and expenses would be allowed. *State of West Virginia ex rel. West Virginia Highlands Conservancy, Inc. v. West Virginia Division of Environmental Protection,* 193 W.Va. 650, 654, 458 S.E.2d 88, 92 (1995).

Where a public official has failed to exercise a clear, legal duty, although the failure was not the result of a decision to knowingly disregard a legal command, there is no presumption in favor of an award of attorneys' fees with the following factors to be considered in whether or not to award attorneys' fees and expenses and in what amount: (a) the relative clarity by which the legal duty was established; (b) whether the ruling promoted the general public interest or merely protected the private interest of the petitioner for a small group of individuals; and (c) whether the petitioner has adequate financial resources such that it could afford to protect its own interests in court and as between the government and the petitioner. *State of West Virginia ex rel. West Virginia Highlands Conservancy, Inc. v. West Virginia Division of Environmental Protection,* 193 W.Va. 650, 654, 458 S.E.2d 88, 92 (1995).

The circuit court determined that the conduct of the Board of Education, while failing to comply with a constitutional mandate, was in good faith and supported by and pursuant to advice and guidance rendered from the State Superintendent. Therefore the court denied Cathe A.'s request for attorneys' fees. However, the record does not show that the circuit court considered the elements set out under *WVEA,* and particularly Syllabus Point 11. Therefore, we reverse the circuit court's ruling on this issue and remand for reconsideration of the attorneys' fees issue by the circuit court.

For the above-stated reasons, the decision of the Circuit Court of Doddridge County is affirmed in part, reversed in part, and re-manded for further proceedings consistent with this opinion.

Affirmed in part; reversed in part; and remanded.

DAVIS, Justice, concurring, in part, and dissenting, in part:

While I concur with the ultimate resolution under the circumstances of this particular case, it is with the almost certain impact that this holding will have on the education of the young people of our State that I simply cannot agree. In concluding that C.E.A. had a constitutional right to an alternative education during the period of his expulsion, the Court has determined, in Syllabus Point 4, that:

For a child who is not permitted to attend regular school pursuant to the provisions of the Productive and Safe Schools Act, *W. Va.Code,* 18A–5–1a(g) [1995], the extent and details of the State's constitutional responsibility to provide other state-funded educational opportunities and services to the child must be determined on a case-by-case basis, based on the unique circumstances of the individual child. A primary consideration in making such a determination must be the protection of school children, teachers and other school personnel; another legitimate concern is the need to effectively deter other children from engaging in prohibited conduct. *W. Va. Const.* art. XII, section 1.

However, the plurality opinion concludes further, in Syllabus Point 5, that:

In extreme circumstances and under a strong showing of necessity in a particular case, strict scrutiny and narrow tailoring *could permit the effective temporary denial of all state-funded educational opportunities and services to a child removed from regular school* under the Productive and Safe Schools Act, *W. Va.Code,* 18A–5–1a(g) [1995], *particularly when the safety of others is threatened by the dangerous actions of a child and where a child is unwilling or unable to utilize educational opportunities and services that are consistent with protecting the safety of others.* *W. Va. Const.* art. XII, section 1.

(Emphasis added). It is with this pronouncement of the educational law of this State that I disagree.

This Court would permit a local board of education to withhold educational services from a student based solely upon a determination that the particular pupil is "too dangerous" to educate through alternative schooling. Nevertheless, the law of this State, with regard to education, indicates otherwise. Article XII, Section 1, of the West Virginia Constitution specifically grants, to each young person of this State, a fundamental constitutional right to a public education: "The legislature shall provide, by general law, for a thorough and efficient system of free schools." Furthermore, we previously, frequently, and explicitly have recognized this educational entitlement in our jurisprudence. In *Pauley v. Kelly,* we reiterated that "[t]he mandatory requirements of 'a thorough and efficient system of free schools' found in Article XII, Section 1 of the West Virginia Constitution, make education a fundamental, constitutional right in this State." Syl. pt. 3, *Pauley,* 162 W.Va. 672, 255 S.E.2d 859 (1979). *See also* Syl. pt. 6, *Randolph County Bd. of Educ. v. Adams,* 196 W.Va. 9, 467 S.E.2d 150 (1995) (same); Syl. pt. 1, *State ex rel. Bd. of Educ. for Grant County v. Manchin,* 179 W.Va. 235, 366 S.E.2d 743 (1988) (same).

With specific regard to disciplinary matters, we recognized in *Keith D. v. Ball* that a student could, by reason of his/her behavior, temporarily forfeit his/her right to attend school. 177 W.Va. 93, 350 S.E.2d 720 (1986). However, in *Keith D.* we did not decide whether a student would, upon suspension or expulsion from regular school, be entitled to receive alternative education in furtherance of his/her constitutional right to an education. Ruling upon this precise issue left unresolved by *Keith D.,* most recently we concluded in the companion opinion to the case *sub judice, Phillip Leon M. v. Greenbrier County Board of Education:*

> Implicit within the West Virginia constitutional guarantee of "a thorough and efficient system of free schools" is the need for a safe and secure school environment. Without a safe and secure environment, a school is unable to fulfill its basic purpose of providing an education. However, the State, by refusing to provide any form of alternative education, has failed to tailor narrowly the measures needed to provide a safe and secure school environment. Therefore, we find that the "thorough and efficient" clause of Article XII, Section 1 of the West Virginia Constitution, requires the creation of an alternative program for pupils suspended or expelled from their regular educational program for a continuous period of one year for the sole reason of possessing a firearm or other deadly weapon at an educational facility. To the extent that *Keith D. v. Ball,* 177 W.Va. 93, 350 S.E.2d 720 (1986), is inconsistent with this opinion, it is modified.

Syl. pt. 4, *Phillip Leon,* 199 W.Va. 400, 484 S.E.2d 909 (1996).

In addition to our longstanding recognition of a young person's fundamental constitutional right to an education, the West Virginia Legislature has determined that, while the particular circumstances of a certain schoolage juvenile may not be amenable to his/her participation in a program of regular education, he/she still is entitled to receive educational opportunities. Consequently, the Legislature specifically has provided for exceptional young people to continue to benefit from an academic setting during a period of suspension or expulsion resulting from the possession of a firearm. *See* W. Va.Code § 18A–5–1a(h) (1996) (Supp.1996). In addition, school-age juveniles who have been temporarily placed in residential facilities maintained by the Department of Health and Human Resources continue to be educated during their stay in these centers. *See* W. Va.Code § 18–2–13h (1996) (Supp.1996). Similarly, adolescents who have been adjudicated delinquent as a result of their transgressions are required to participate in daily educational programs during their confinement in institutions operated by the Department of Corrections. *See* W. Va.Code § 18–2–13f (1988) (Repl.Vol.1994). *See also* W. Va.Code § 25–4–5 (1975) (Repl.Vol.1992) (providing for educational instructors at centers housing youthful male law offenders).

Given these numerous examples of other students who are entitled to receive educational services despite their particular circumstances and, in the case of juveniles who have been adjudicated delinquent, even in spite of their previously illegal behavior, I am hard-pressed to determine how a pupil in the position of C.E.A. or J.P.M. could ever be denied an education when these are precisely the students who most require, and who would most benefit from, academic intervention. Particularly in light of the overarching fundamental constitutional right to an education and the fact that delinquent juveniles are afforded educational opportunities, I have difficulty understanding how a student such as C.E.A., who has been expelled, but not adjudicated to be delinquent, could be denied such services based upon a perceived danger to the alternative education instructors or students. In this vein, counsel for the Attorney General of West Virginia best expressed this inconsistent irony: "Surely, it was not intended that a child who has ended up in the criminal justice system, who has been adjudicated a juvenile delinquent [sic] has greater constitutional rights than a child who has engaged in conduct that does not rise to the level of delinquency."

If more violent juveniles residing in correctional facilities are not perceived as too dangerous to educate, then students committing far lesser transgressions resulting solely in expulsion should not be denied their constitutional right to learn. In fact, it is precisely these students, who have not yet deviated from lawful behavior, to whom we should turn our greatest attention in assuring their constitutional right to an education in hopes of preventing their criminal demise. Unfortunately, the decision rendered by this Court will do nothing but give educators a license to refuse such services based upon a discretionary assessment that a particular young person "threatens the safety of others." In the companion case to the one presently before us, which this Court has seen fit to

modify, *see* Syllabus Point 6 (modifying *Phillip Leon* ), Judge Recht most eloquently prophesied the inherent inequities certain to result from this Court's decision:

Without alternative education, children similar to J.P.M. become orphans, abandoned by the educational system, without anyone to educate them and give them the opportunities inherent in being an educated person. Children with more disruptive behavior are educated within the criminal justice system. Children with financially able parents are educated privately. Children with disabilities that may create disruptions are educated within the public system. Children with similar disruptive behavior in other counties are educated through alternative schools or other programs. If the West Virginia Constitution makes education a fundamental right, then children similar to J.P.M. must be afforded an education and services.

*Phillip Leon,* 199 W.Va. at 406, 484 S.E.2d at 916 (footnote omitted). Let us hope that the discretion authorized by this Court will be closely guarded.

Accordingly, for the foregoing reasons, I respectfully concur, in part, and dissent, in part, from the decision of the Court.

WORKMAN, Chief Justice, concurring, in part, and dissenting, in part:

The majority's opinion is very disingenuous. While purporting to find the Safe Schools Act, West Virginia Code § 18A–5–1a(g) (1995) constitutional, it actually finds the statute to be unconstitutional in its application,[1] based on its premise that this State's Constitution requires the provision of an alternative education in all but the most extreme factual circumstances. In an ideal world it surely would be preferable to provide an alternative education to students who are expelled; and even in our own imperfect world, it is still a better idea to do so (at least in my opinion). However, we are judges, *not* legislators; and unless the legislation is de-

---

1. The majority is clever but rather devious in its placement of unconstitutionality on the State Superintendent of School's policy regarding the lack of a mandatory obligation to provide state-funded educational services to expelled students. It is actually quite clear on the face of the statute

that no alternative education is required for expelled students. Thus, if the majority was honest, they would say that the statute was unconstitutional in its application. Instead, they take the circuitous route of pronouncing the policy to be unconstitutional.

termined to be unconstitutional, it is really properly a legislative decision as to what is a good idea. Thus, the only proper inquiry for this Court is whether our state constitution *requires* the provision of such educational services. And the answer to this question is quite clearly that the constitution does not require it.

Despite this State's recognition of a constitutional right to a free public education, Syl. Pt. 3, *Pauley v. Kelly,* 162 W.Va. 672, 255 S.E.2d 859 (1979), this right, like other constitutional rights, may be forfeited temporarily. *See Barker v. Hardway,* 283 F.Supp. 228, 238 (S.D.W.Va.), *aff'd per curiam,* 399 F.2d 638 (4th Cir.1968), *cert. denied,* 394 U.S. 905, 89 S.Ct. 1009, 22 L.Ed.2d 217 (1969). Thus, because the right to education is not absolute, but contingent upon appropriate conduct in conformity with state law and school rules, a student may temporarily forfeit his or her right to an education as a result of disruptive conduct. *See Keith D. v. Ball,* 177 W.Va. 93, 350 S.E.2d 720 (1986), *holding limited by Leon M. v. Greenbrier County Bd. of Educ.,* 199 W.Va. 400, 484 S.E.2d 909 (1996).

The Doddridge County Board of Education ("Board") convincingly argues that the strict scrutiny analysis typically reserved for denial or infringement of fundamental rights, *Lewis v. Canaan Valley Resorts, Inc.,* 185 W.Va. 684, 408 S.E.2d 634 (1991), is not invoked by a temporary suspension or expulsion from the public schools. The Board suggests that the strict scrutiny analysis—the highest level of constitutional analysis—should only be applied where the right to education is totally denied, such as in a case of permanent expulsion from school. But the right to a public education exists until a child reaches the age of twenty-one; thus, even in the face of a twelve-month expulsion under the Safe Schools Act, an education is not denied, but only *temporarily* forfeited because of the valid legislative recognition that our schools must be made safe for both the students and the teachers. Because the student is clearly entitled to continue his education upon the expiration of the expulsion period, it is not necessary or legally correct to view the temporary suspension of the right to an education in the same analytical manner (i.e. strict scrutiny) as a permanent denial of a student's right to a public education. *See Ball,* 177 W.Va. at 95, 350 S.E.2d at 723 n. 3 (stating that "fact that the forfeiture is temporary is important" and that "temporary deprivation of constitutional rights does not require the protection that a permanent deprivation would") (citing Syl. Pt. 2, *North v. West Virginia Bd. of Regents,* 160 W.Va. 248, 233 S.E.2d 411 (1977)).

In the recent decision of *Doe v. Superintendent of Schools,* 421 Mass. 117, 653 N.E.2d 1088 (1995) involving the expulsion of a student for bringing a lipstick case knife to school, the court determined

since her expulsion was rationally related[2] to the maintenance of order in the school, the defendants' decision not to provide the plaintiff with an alternate education does not render her expulsion unconstitutional.

This is consistent with our holding in *Board of Educ. v. School Comm. of Quincy,* 415 Mass. 240, 244–246, 612 N.E.2d 666 (1993), *that there is no requirement under Massachusetts law that a school system provide an educational alternative to a student who properly has been expelled for disciplinary reasons.* It reasonably may be argued that a requirement that a student who is expelled for misconduct, no matter how egregious, be provided with alternate education by a public school system, would be likely to have a serious detrimental effect on the ability of school officials to deter dangerous behavior within a school by imposing expulsion as a sanction. *In any event, we think that it is for the Legislature, not the courts, to decide when, if ever, alternative education must be provided to students expelled for disci-*

---

**2.** The court in *Doe* concluded that the proper review mechanism is the rational basis test rather than strict scrutiny analysis after examining the Massachusetts equivalent of *Pauley v. Kelly* and concluding that the right to an education, while emanating from the Massachusetts Constitution, was not a fundamental right "in the same sense that the constitutional guarantees of freedom of religion and freedom of speech and the press are considered fundamental." 653 N.E.2d at 1095–97 and n. 4.

*plinary reasons, and the form such education must take.*

653 N.E.2d at 1097 (emphasis supplied).

In addressing the obligation of the North Carolina school system to provide an alternative education to an expelled student, the court opined:

A student's right to an education may be constitutionally denied when outweighed by the school's interest in protecting other students, teachers, and school property, and in preventing the disruption of the educational system. As a general rule, a student may be constitutionally suspended or expelled for misconduct whenever the conduct is of a type the school may legitimately prohibit, and procedural due process is provided. *Reasonable regulations punishable by suspension do not deny the right to an education but rather deny the right to engage in the prohibited behavior.*

*The public schools have no affirmative duty to provide an alternate educational program for suspended students in the absence of a legislative mandate.* Rapp, Education Law, Vol. 2 Sec. 9.06(3)(d)(1986).

*In re Jackson,* 84 N.C.App. 167, 352 S.E.2d 449, 455 (1987) (citation omitted and emphasis supplied).

Like the courts in *Jackson* and *Doe,* I conclude that neither this State's Constitution nor the laws of this State require that an alternative education be provided to those students properly expelled pursuant to the Safe Schools Act. I further concur with the conclusion reached in both of those cases—that it is a *legislative* decision whether to provide for an alternative educational opportunity, and in the absence of such a legislative mandate, alternative education is simply not required for the temporary forfeiture of the right to receive a public education. At first glance, the majority appears to recognize its limited role in this matter, from its acknowledgment that "[t]he crafting of de-tailed procedures and standards for implementing the State's compelling interest in ensuring safe schools ... is a matter properly left to the legislative and executive processes[,]" and its admission that "[i]t is not the business of this Court to make detailed policy or prescriptions." Yet, these statements amount to nothing more than doublespeak, as the majority proceeds to enmesh itself firmly in the middle of policy decisions that are properly the subject of the legislative domain. The majority opinion provides a good example of why this Court needs to avoid intruding into the legislative arena whenever it disagrees with legislative policy or sees an opportunity to inject its perspective into an area of unsettled law. *See Randolph County Bd. of Educ. v. Adams,* 196 W.Va. 9, 24, 467 S.E.2d 150, 165 (1995) (discussing concept of judicial restraint as requiring "defer[ence] to rationally based legislative enactments").

The federal legislation that impelled the enactment of the Safe Schools Act does not require states to make alternative educational services available; neither does it forbid alternative educational arrangements. Clearly, the state legislation is quite similar. The current state-wide policy grants full discretion to each county to provide alternative education on a case-by-case basis. *See* 126 C.S.R. § 20.

The majority mistakenly takes the view that the State has sanctioned a denial of alternative education to all expelled students. If the Legislature had precluded counties from providing alternative educational services to expelled students, then we would be dealing with a constitutionally-elevated issue properly entitled to strict scrutiny analysis. In this case, however, what the Legislature (and the Superintendent in the policy) has done is to leave to the discretion of the counties the decision of whether to provide alternative educational services in such instances.[3] It may have been the Legislature's conclusion that any funds diverted to alterna-

---

3. The argument can certainly be made that, given the lack of even one individual expelled pursuant to West Virginia Code § 18A–5–1a(g) during the 1995–96 school year, it may not be necessary or cost effective to set aside funding or develop such alternative programming on a county-wide basis. Moreover, because the nature of the student's violent behavior and tendencies would have to be considered in each and every case, a standardized approach to the extension of such educational services would not appear possible or prudent.

tive education for kids bringing weaponry to school would be funds taken away from the education of kids who come to school and follow the rules. Many schools have already had to obliterate music and art from their curricula. Special education has endured substantial cutbacks. Now it appears that the majority would siphon more money away from the general student population by their requirement of an alternative education to kids who won't follow the rules.

Furthermore, while the majority recognizes this need to determine on a case-by-case basis the services for a given expelled child, it then fails to identify who is to make this determination. The majority also suggests that the extent of the State's constitutional responsibility to provide alternative educational services is similarly to be determined on a case-by-case basis, but it does not identify who is to make this determination. Thus, the majority cloaks the obligation that they have placed upon the State as to who is to make these case-by-case determinations in a cloud of confusion and irresoluteness.

I am authorized to state that Justice MAYNARD joins in this separate Opinion.